IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Emily-Jean Aguocha-Ohakweh *et al* on behalf of the United States of America and The State of Texas | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION NO. 4:16-mc-964 |
| *Baylor College of Medicine, Harris County Hospital District, et al* | § | |
| *Defendants* | § | |

FIRST AMENDMENT TO FALSE CLAIMS ACT COMPLAINT "QUI TAM"

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America and The State of Texas, by and through *qui tam* Relator, Emily-Jean Aguocha-Ohakweh, brings this action under 31 U.S.C. §§ 3729-32 (The "False Claims Act") and Texas Human Resources Code Chapter 36 ("Texas Medicaid Fraud Prevention Act") to recover from Baylor College of Medicine ("Baylor"), Harris Health System aka Harris County Hospital District d/b/a Ben Taub Hospital ("Harris Health"), University of Texas Health Sciences Houston ("UT"), *et al*, for all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States, State of Texas, and themselves and would show unto the Court the following:

1. INTRODUCTION

A related case to this was originally filed in the 270th Judicial District Court, Harris County, TX; cause number 201576259.

2.  <u>PARTIES</u>

1.  Realtor, Emily-Jean Aguocha-Ohakweh is an individual who resides in The State of Minnesota and brings this action on behalf of herself and family members of Dr. Alphaeus Ohakweh ("Family-Plaintiffs").

2.  Realtor, Bethrand Ohakweh, an individual who resides in Brazoria County, TX; is a Family-Plaintiff; is the sole Independent Administrator of the Estate of Dr. Aphaeus Ohakweh ("Decedent"); and brings this action as administrator on behalf of the Estate.

All Plaintiffs are altogether and each sometimes separately referred to herein as "Plaintiffs".

3.  Defendants Martha P. Mims, Santiago Lopez, Anisha Gupta, William Robert Graham, Lydia Jane Sharp, Xiaoming Jia, Sudha Yarlagadda, Anita V. Kusnoor, Veronica Vittone, Jared Jung-Taek Lee, Wayne X. Shandera, Holly J. Bentz, Doris Lin, Elizabeth S. Guy, Van Vi Hoang, Christina C. Kao, Pralay Kumar Sarkar are all individuals who reside, maintain minimum contacts via employment, or do business in Houston, TX.  During the incident complained of they were all employees of Baylor College of Medicine working as Texas State government agent employees at Ben Taub Hospital in Houston, TX.  They have all responded to the lawsuit.

4.  Defendant Joslyn Fisher is an individual who resides, maintain minimum contacts via employment, or does business in Houston, TX.  During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX, and as a member of Harris Health System's Texas Health and Safety Code 166.046 Ethics Board.  She has responded to this lawsuit.

5.  Defendant Baylor College of Medicine is a duly registered Texas Non-Profit Corporation doing business in Houston, TX. During the events complained of, it is classified as a Texas

State agency pursuant to a Texas Health and Safety Code § 312.004 agreements.  It has responded to this lawsuit.

6.  Defendant Harris County Hospital District d/b/a Harris Health System d/b/a/ Ben Taub Hospital is a county governmental entity that owns and operates Ben Taub Hospital in Houston, TX.  It has responded to this lawsuit.

7.  Defendant Diana M. Guerra is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation at her business address located at 6620 Main St Ste 1225, Houston, TX 77030.  She may also be found at 1504 Taub Loob, 6th Floor, Houston, TX 77030.

8.  Defendant Elain Chang is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation at her listed primary practice address 2121 EL PASEO #2102 Houston, TX 77054, or wherever she may be found.

9.  Defendant Suresh Manickavel is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.   He may be served with citation at his listed primary

practice address Baylor College of Medicine, GME Office, One Baylor Plaza, Room 022D, Houston, TX 77030, or wherever he may be found.

10. Defendant David John Hyman is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.   He may be served with citation at his listed primary practice address Ben Taub Hospital/Baylor Department of Medicine, 1504 Taub Loob, Houston, TX 77030 or wherever he may be found.

11. Defendant Jatinder P Hothi is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his mailing address 8181 Fannin St. Apt. 2235 Houston, TX 77054, or wherever he may be found.

12. Defendant Stephen R. Bujarski is an individual who resides, maintains minimum contacts, or does business in Houston, TX.  During the incident complained of he employed by Baylor College of Medicine in Houston, TX and working at Ben Taub Hospital in Houston, TX as a Texas State government agent employee.  He may be served with citation at his business address located at 1 Baylor Plaza, Internal Medicine, Houston, TX 77030, or at 1504 Taub Loob, 6th Floor, Houston, TX 77030.

13. Defendant Vinny Oommen is an individual who reside, maintain minimum contacts via employment, or does business in Houston, TX.  During the incident complained of, she/he was a social worker for Harris Health System at Ben Taub Hospital in Houston, TX.  She/he

may be served with citation at business address: 1504 Taub Loop, Houston, TX 77030 or wherever she/he may be found.

14. Defendant John Michael Halphen (MD/JD) is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of University of Texas Health Sciences Center in Houston, a Texas State government agent employee working at Ben Taub Hospital, and also the Chair of Harris Health System's Texas Health and Safety Code 166.046 Ethics Board. He may be served with citation at 1504 Taub Loop, Houston, TX 77030, or wherever he may be found.

15. Defendant Barbara Johnson is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of, he was the risk manager at Baylor College of Medicine. She may be served with citation at her business address located at One Baylor Plaza, MC No. BCM 208, Houston, TX 77030 or wherever she may be found.

16. Defendant Joseph Shimon Kass (MD/JD) is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of, he was a health care provider at Ben Taub Hospital in Houston, TX, and a member of the Harris Health System Ethics Board. He may be served with citation at his business address located at 1504 Taub Loop, Neurology Department, Houston, TX 77030. He may also be found at Baylor College of Medicine, Neurology Department, 6501 Fannin St, Houston, TX 77030.

17. Defendant Susan Amelia Eicher is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation at her business address located at 6550 Fannin St., Suite 1727, Smith Tower, Houston, TX 77030.

18. Defendant Paul Edward Kwak is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation through his attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

19. Defendant Suman Rajagopalan is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation through her attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

20. Defendant David Mathew Wynne is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served

with citation through his attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

21. Defendant Cliff J. Whigham is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his business address located at Baylor College of Medicine, Radiology, 1504 Taub Loop, Ste 1E05, Houston, TX 77030.  He may also be served via certified mail at One Baylor Plaza Mail Stop 360, Department of Radiology, Houston, TX 77030.

22. Defendant James Parker Gregg is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his business address located at Baylor College of Medicine, Radiology, One Baylor Plaza Mail Suite 165B, Houston, TX 77030.

23. Defendant Rajeev Raghavan is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his business address located at Baylor College of Medicine, BCM 620, Houston, TX 77030.

24. Defendant Veeral Mehta is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was

an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his residence address located at 2300 Old Spanish Trial, Apt 1015, Houston, TX 77045, or wherever he may be found.

25. Defendant Mimi Phan an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation at his residence address located at 2300 Old Spanish Trial, Apt 1015, Houston, TX 77045, or wherever he may be found.

26. Defendant Thankamma Macadin is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he/she was an employee of Harris Health System at Ben Taub Hospital in Houston, TX.  He/she may be served with citation at business address located at 1504 Taub Loob, Houston, TX 77030, or wherever she/he may be found.

27. Defendant Sean Reilly is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of she/he was an employee of Harris Health System at Ben Taub Hospital in Houston, TX.  He/she may be served with citation at business address located at 1504 Taub Loob, Houston, TX 77030, or wherever she/he may be found.

28. Defendant Courtney N Miller-Chism is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident

complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX. She may be served with citation at her address located at ONE BAYLOR PLAZA, MS: BCM187, HOUSTON, TX 77030.

29. Defendant Erika Spuhler is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of she was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX. She may be served with citation at her address located at 1330 Old Spanish Trail, Apt 4311, Houston, TX 77054.

30. Defendant Daniel Ying Wang is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX. He may be served with citation at his address located at 2300 OLD SPANISH TRAIL UNIT 1049; Houston, TX 77054.

31. Defendant Lamaya Blair is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of she/he was an employee of Harris Health System at Ben Taub Hospital in Houston, TX. He/she may be served with citation at business address located at 1504 Taub Loob, Houston, TX 77030, or wherever she/he may be found.

32. Defendant James Banfield is an individual who resides, maintains minimum contacts, or does business in Houston, TX. During the incident complained of he was working as a Director of Risk Management at Baylor College of Medicine in Houston, TX. He may be

served with citation at his office One Baylor Plaza, MC No. BCM 208, Houston, TX 77030 or wherever he may be found.

33. Defendant Herbert Ortiz is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of she/he was an employee of Harris Health System at Ben Taub Hospital in Houston, TX.  He/she may be served with citation at business address located at 1504 Taub Loob, Houston, TX 77030, or wherever she/he may be found.

34. Defendant Raichel Elan Hailey is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of she/he was an employee of Harris Health System at Ben Taub Hospital in Houston, TX.  He/she may be served with citation at business address located at 1504 Taub Loob, Houston, TX 77030, or wherever she/he may be found.

35. Defendant John Austin Hancock is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX. During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  He may be served with citation through his attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

36. Defendant Greg Broering is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  On or about 11/02/2015, he became a

Texas Medical Board licensed physician with license number Q6396.  He may be served with citation through his attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

37. Defendant Sarah Moorhead Palmquist is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation through her attorney, Jeffrey McClure at Andrews Kurth, LLP, 600 Travis, Suite 4200, Houston, TX 77002.

38. Defendant Ghana Kang is an individual who resides, maintains minimum contacts via employment, or does business in Houston, TX.  During the incident complained of he was an employee of Baylor College of Medicine working as a Texas State government agent employee at Ben Taub Hospital in Houston, TX.  She may be served with citation at her address located at 744 BRICK ROW #2360 RICHARDSON, TX 75081.

39. Defendant University of Texas Health Sciences Center Houston (UT) is a duly registered Texas non-profit entity, headquartered in Houston, TX, and is an agency of the State of Texas.  It may be served process via its President, Larry R. Kaiser, M.D. at 700 Fannin, Suite 1200, Houston, TX 77030.  Citation must also be served on the Texas Secretary of State via certified mail return receipt.

All Defendants are altogether and sometimes each separately referred to herein as "Defendants".

### 3.   JURISDICTION & VENUE

This Court has original jurisdiction over this case pursuant to 28 U.S. Code § 1331 because it is a civil action with some claims arising under the Constitution, laws, or treaties of the United States – specifically 42 U.S. Code § 1983 and 42 U.S. Code § 1395dd; and 31 U.S.C.§3732(a) (False Claims Act).

Venue is proper in the Southern District of Texas pursuant to 28 U.S. Code § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within the Southern Jurisdictional District - Houston, TX.

Venue is also proper for the claims pursuant to Texas Human Resources Code § 36.052(d) as it is a Court in Harris County, TX, where some part of the unlawful acts occurred.

4.   <u>FACTUAL BACKGROUND</u>

5.   Pursuant Section 9C of the current Health & Safety Code 312.004 agreement between Texas Higher Education Coordinating Board and Baylor College of Medicine, "Nothing in this Agreement shall be construed to violate any provision of the laws and/or regulations of the United States of America or the State of Texas, and all acts done hereunder shall be done in such manner as may conform thereto…"

6.   Pursuant Section 9F of the current Health & Safety Code 312.004 agreement between Texas Higher Education Coordinating Board and Baylor College of Medicine, "Medical school shall comply with all federal, state, and local laws, statutes, ordinances, rules and regulations and the orders and decrees of any court or administrative bodies or tribunals in an matter affecting the performance of [the] Agreement…"

7. Similar language as Sections C & F above are also in the original version of the agreement between Texas Higher Education Coordinating Board and Baylor College of Medicine that was effective September 1, 2013 and terminated on August 31, 2015.

8. Pursuant Section 2.1.4 of the current Health & Safety Code 312.004 agreement between Harris County Clinical Services and Affiliated Medical Services (the contracting entity for Baylor and University of Texas Health Sciences Houston for the medical services at Harris County District Medical Facilities – e.g. Ben Taub Hosptial), "AMS will ensure that the Subcontractors perform the obligations and responsibilities set forth in this Agreement by entering into Service Subcontracts with Subcontractors that incorporate the terms and provisions of this Agreement."

9. Pursuant Section 3.1.5 of the current Health & Safety Code 312.004 agreement between Harris County Clinical Services and Affiliated Medical Services "AMS, through the Subcontractors, shall supply Providers to the Hospital on a **daily 24-hour basis** and to the Community Health Center and Hospital Based Clinics, consistent with their operating hours..."

10. Hospitals are defined as: "... hospital facilities operated by the District known as Ben Taub General Hospital, the Lyndon B. Johnson General Hospital,..."

11. Providers are defined as: "Physicians, House Staff, Allied Health Professionals and other health care professionals affiliated with Subcontractors and assigned by AMS to provide patient care services to the patients in the District Facilities – each of which Providers must, to the extent required and as appropriate, apply for, be awarded, and maintain in good standing (a) any applicable state licensure required of such Provider and (b)

membership privileges in the Medical Staff as provided for by the Medical Staff Bylaws of the District…" will ensure that the Subcontractors perform the obligations and responsibilities set forth in this Agreement by entering into Service Subcontracts with Subcontractors that incorporate the terms and provisions of this Agreement."

12. Pursuant Section 3.8 of the current Health & Safety Code 312.004 agreement between Harris County Clinical Services and Affiliated Medical Services "AMS, recognizes that the District participates in various third-party payment programs including, without limitation, government-funded programs…, health maintenance organizations, and various insured and self-insured health benefit plans…. AMS agrees to promptly record for it or the District all information that is necessary in order for the District to comply with the requirements of the Medicare Conditions of Participation and the Medicaid State Plan…"

13. Pursuant Section 5.1 of the current Health & Safety Code 312.004 agreement between Harris County Clinical Services and Affiliated Medical Services "…AMS, through the Subcontractors, agrees to provide health care services in District Facilities in a manner consistent with quality patient care **and in accordance with State and Federal law** and the standards established by appropriate accrediting agencies…"

14. Pursuant Section 5.2 of the current Health & Safety Code 312.004 agreement between Harris County Clinical Services and Affiliated Medical Services "AMS, through the Subcontractors, must provide health care services in a manner consistent with the rules, regulations, statutes, or standards of appropriate accrediting agencies…"

<u>Short Summary</u>

15. There is too much in this case.

16. *Amongst others*, due to various deprivation of Plaintiffs' substantive due process and other clearly secured constitutional rights, there's a dead person (via homicide), material forged documents that violate both Texas Penal Code 32.21 and 32.46, lots of conflicting statements and cover-up's, many conspiracies and acts in furtherance of conspiracies to obstruct justice and further deprive Plaintiffs of their clearly secured federal and constitutional rights, and a family that seeks the truth as well as justice.

First Hospital Visit

17. On December 12, 2013, Decedent, a 64yr old man from Nigeria arrived at Ben Taub Hospital complaining of shortness of breath.

18. Decedent is not a medically trained professional.

19. On 12/13/2013 as of 9:06AM, he was diagnosed with Acute Myeloid Leukemia ("AML") and Neutropenia, by Baylor resident physician Dr. Lin Dai **working under the oversight** of a Dr. George R. Parkerson III.  However, per the medical records, Decedent's AML was considered "medium priority," and the Neutropenia considered "high priority."

20. On the same 12/13/2013 and at 10:44AM, a Dr. Athreya Khannan of the internal medicine department examined Decedent and determined that Decedent need platelet and red blood cells transfusion.

21. On the same 12/13/2013, a Dr. Vishal Delman MD's determined that Decedent tested positive for only fever, chills, fatigue, facial swelling, cough, shortness of breath, and headaches; but tested negative for any eye, respiratory, cardiovascular, gastrointestinal, endocrine, genitourinary, musculoskeletal, skin, allergic/immunologic, or

psychiatric/behavioral issues.   He disregarded treating the AML, and executed a paracentesis (invasive) procedure instead.

22. On 12/14/2013, Dr. Lin Dai this time **working under the oversight and authorization** of a Dr. Patrice Latimer, noted in his records that he was being transported by wheelchair, and **needed chemotherapy**.

23. No treatment for chemotherapy was done nor chemo procedures instituted on 12/14/2013.  On 12/19/2013 around 6:35AM, a family medicine resident physician intern – Dr. Erika Spuhler, ordered a bronchoscopy on Decedent.  According to her progress notes, the physicians "need biopsy for certainty of ruling out infectious etiology prior to initiation of chemotherapy."

24. Rather, on 12/18/2013, a biopsy procedure was done on Decedent's pelvic area around midnight, for sample examination purposes.  A Dr. David Wynne was involved in the pelvic venture.  No chemotherapy.

25. According to Exhibit E, from the American Cancer Society, chemotherapy is to be started within days of diagnosis for leukemia as it quickly spreads through the bloodstream.

26. 12/19/2013 around 6:35AM, a family medicine resident physician intern – Dr. Erika Spuhler, ordered a bronchoscopy on Decedent.  According to her progress notes, the physicians "need biopsy for certainty of ruling out infectious etiology prior to initiation of chemotherapy."

27. A Resident Fellow physician, Dr. Christopher Howard, did a flexible bronchoscopy on Decedent on 12/19/2013, **under the oversight** of a pulmonologist, Dr. Amit Parulekar.  The bronchoscope was inserted into Decedent via the mouth.  Informed (written) consent

was obtained.  Anesthesia was also properly administered; the procedure went well and there were no complications.

28. There was "nonspecific abnormal findings on radiological and other examination of lung field."  Dr. Amit recommended waiting lab results on specimens for microbiology and cytology.

29. The next morning, 12/20/2013, a Dr. Deborah Citron received the bronchoscopy cell tissue samples of Decedent's "lung, right middle lobe, bronchoalveolar lavage" collected on 12/19/2013, and concluded that the specimen received was satisfactory for evaluation and **negative for malignancy**.  Again, still no chemotherapy.

30. On 12/14/2013 at 11:53am, 12/16/2013 at 11:18am, 12/17/2013 at 2:46pm, 12/18/2013 at 1:22pm, and at 12/19/2013 at 10:01am, Dr. Ghana Kang wrote in Decedent's medical records:

"…please consult social worker (citizenship, gold card, and etc.) to assess if he's a candidate for BMT later on."

31. BMT means bone marrow transplant.

32. On 12/15/2013 at 12:22pm and 12/20/2013 at 1:57pm, Dr. Daniel Y. Wang also wrote in Dr. Ohakweh's medical records:

"…please consult social worker (citizenship, gold card, and etc…) to assess if he's a candidate for BMT later on."

33.  On 12/22/2013 at 1:08pm, Dr. Daniel Y. Wang wrote again in Decedent's medical records:

"Also addressed his current residency status (on Visa) and lack of coverage (not eligible for Gold Card as he is living in Brazoria County)"

34. On the same 12/22/2013, a teaching physician by the name of Dr. Martha P. Mims MD, examined Decedent, and met with Decedent and his son- Bethrand.  According to Dr.

Mims, Decedent had lung lesions that the physicians were not were unable to understand the source, but his AML was the most life threatening matter.   Dr. Mims then noted a challenging "social situation" regarding Decedent's visa immigrant status, the need for likely prolonged hospital retention and treatment, and payment issues.

35. According to Bethrand, during the meeting, Dr. Mims inquired as to if Decedent or his family had money to pay for the chemotherapy treatment.  However, per Dr. Mims' report, Dr. Mims excludes her inquiry statement as to payment of treatment.  She rather states "The son reports that the father can pay for his treatment. They asked me how much money it would be and I said that it would run into the thousands, probably tens of thousands of dollars.  I think case management needs to be involved immediately."

36. Bethrand would testify that they would not have asked about the cost of the treatment if Dr. Mims had not first inquired as to payment.

37. On 12/28/2013 and on 1/1/2014, Dr. Spuhler noted in Decedent's records of the payment issue, stating that Decedent was a "candidate for a Gold Card… if is not unable to obtain, he is eligible for emergent Medicaid.  Will need to stay inpatient for now as he is requiring blood products to maintain adequate erythrocyte and platelet levels."

38. Bethrand frequently visited his father and watched him physically deteriorating at Ben Taub Hospital without chemo treatment.  During his visits, Bethrand frequently inquired as to the lack of institution of the chemotherapy on his father, but was rather met with responses regarding payment from the physicians.

39. On 1/10/2014, on the 39th day after the AML diagnosis of Decedent, Decedent finally was provided with his first chemotherapy treatment for his AML.

40. On a 1/25/2014, after the necessary chemotherapy – the basis for the bronchoscopy venture – had already begun, the results of the lung samples collected from Decedent at the bronchoscopy were disclosed to be "negative to date on cultures" and "no blasts identified on pathology report."

41. There was no showing of acute development of cancer cells in the lungs tissues taken from Decedent during the bronchoscopy.

42. On 1/26/2014 at 3:39pm, Dr. Courtney N Miller-Chism wrote in his medical records:

"I discussed the case with the resident and agree with the diagnosis of:…Spoke to patient, son, and primary team. It is doubtful that patient will get gold card. He is awaiting Emergency medicaid. His ANC remains above 500. We will discharge him and arrange for BM biopsy to assess for remission on 2/4 and heme f/u appt on 2/12. This will give us time for the BM to recover and hopefully for the medicaid to kick in. He also has f/u with family medicine on 2/7."

43. On 2/11/2014, Dr. William Y. Huang you wrote in Dr. Ohakweh's medical records:

"Patient currently without gold card, awaiting visa status change, asked him to call me if visa status changes so we can proceed with CXR and other tests."

44. Ultimately, Decedent received two of three scheduled chemotherapy treatments, and left the hospital around mid-2014.

45. Decedent and his family arranged for payment with the hospital claims department, and paid their required co-pay for the medical services provided to Decedent as of 2014.

46. Decedent was able to return to his routine active lifestyle, which included playing tennis.

<u>Second Hospital Visit</u>

47. On or about March 4, 2015 Decedent again arrived from Nigeria to receive the best care anyone can think of.  Upon arrival his son Bethrand drove him directly to the hospital for evaluation.

48. Decedent walked into Ben Taub Hospital with his son for treatment complaining of fatigue, shortness of breath (SOB), cough, and chest pain (CP).

49. A physician- Dr. Tolu Olade at Ben Taub Hosptial attended to him.  Decedent was tired but yet coherent while answering the doctor's questions.

50. Per medical reports, Decedent had no allergies to any medication.  Dr. Tolu Olade relayed to Decedent's son that based upon her team's assessment, Decedent had an acute renal injury, low blood counts indicative of a possible Acute Myeloid Leukemia (AML) relapse, and that his chest x-rays showed dispersed infiltrates in his lungs uncharacteristic of pneumonia.  Decedent's son expressed to Dr. Tolu Olade that he had been treated for leukemia in 2014, and that those infiltrates were present then, and were negative for any type of bacterial or fungal infection.

51. Also upon evaluation in the emergency department ("ED") at Ben Taub hospital Decedent's initial vital signs showed an elevated heart rate at 110 beats per minute (normal is 60 to 100), and oxygen saturation (measure of how much oxygen is dissolved in one's blood) of 91% (normal is >95%).

52. While in the ED, it is documented that Decedent's oxygen saturation would occasionally drop to the 80's requiring them to place an oxygen mask around his mouth and nose for intermittent respiratory support.

53. With the mask on, his saturation quickly improved to normal levels. As documented in the initial intake notes by the doctors, Decedent was responsive, able to give a full history about his condition and answer all their questions. The only positive finding on physical examination by the doctors was that Decedent had "decreased breath sounds in the right

and left lower lung fields." This led to a work-up, as would any Decedent presenting to the ED in Decedent's state, that included blood work, non-invasive imaging of the lungs, and non-invasive evaluation of his heart.

54. Ben Taub Hospital's team of ED physicians made a decision to admit Decedent to a unit on the 4th floor for further evaluation.

55. Decedent's primary care was under that of inexperienced Family Medicine resident physicians, with consulting services from inexperienced Hematology/Oncology resident physicians, and inexperienced and unqualified Medicine Intensive Care Unit (MICU) physicians and personnel. It was the overall impression of the team of doctors that Decedent's respiratory status was a result of 1) pneumonia or 2) leukemic infiltrates due to a relapse of his AML.

56. The medical team consisting of Family Medicine, Hematology/Oncology, MICU physicians overseeing Decedent from admission until 3/6/2015 were mostly residents and fellows that included Dr. Elain Chang (Resident- Hematology/Oncology), Ghana Kang (Hematology Fellow), Jatinder Hothi (Nephrology Fellow), Mahsa Yazdan Bakhsh (Resident – Family medicine), and Allison Uyemura (Resident - Obstetrics & Gynecology), and Jianbo Wang (Heamtology/Oncology fellow).  This is the same **Ghana Kang** that was in the first hospital visit and participated in the Gold Card inquisition in the first hospital visit, aware of Decedent's necessary care - chemotherapy, aware or should have been aware that Decedent's results were negative per the first visit's bronchoscopy results.

57. Decedent disclosed his history of AML and chemo to the staff.  He told the resident MICU physician Dr. Elain Chang, "I think my illness is coming back" after his admission on said

3/4/2015.  Dr. Chang noted of Decedent's leukemia history in the medical records, reviewed his CT chest imaging with the Medical Fellow on staff, Dr. Jatinder P Hothi, and concluded that the results were "suggestive of infection or leukemic infiltration."

58. Dr. Chang noted that Decedent's oxygen requirements were not excessive, but suggested the need for a "bronchoscopy to distinguish between infection vs. leukemic pulmonary infiltrates." She discussed her diagnosis and treatment suggestion with the Fellow, and no attending physician.  To address the possibility of pneumonia, antibiotics were started empirically. However to address the possibility of AML relapse, a hematology/oncology specialist needed to weigh in their input and ultimately start chemotherapy as soon as possible, without delay.  This did not happen.

59. In the early morning on 3/5/15 a rapid response was called on Decedent. It is documented by the nurse Decedent's oxygen saturation reached to 80% while on the oxygen mask. Decedent was assessed by the team of inexperienced and unsupervised physicians, and the decision was made to escalate his care and transfer him to the MICU and place him on Bilevel Positive Airway Pressure (BiPAP), a form on non-invasive mechanical ventilator (respiratory) support.

60. The unsupervised and inexperienced MICU team was now the primary team after Decedent was transferred and thus responsible for making decisions about his care. While on the BiPAP, Decedent showed stable improvement in his respiratory status, however was overall still suffering from hypoxemia (i.e. low blood oxygen) and as a result in critical condition according to the inexperienced and unsupervised MICU team.

61. Again, mostly residents and fellows were overseeing Decedent since his admission to the 4th floor on 3/4/2015.  However, as of the 3/5/2015 rapid response, a Dr. Jingyin Yan (Nephrology physician with less than three years license experience), was the only fully licensed attending physician that examined Decedent.

62. Even Mr. Yan, in his progress notes noted the need to consult Hematology/oncology specialist to determine the best course of treatment.

63. Rather, the inexperienced and unsupervised physicians sought treatment or drug-related recommendation advise from two clinical pharmacists; not the Hematology/oncology physician.

64. The two hematology/oncology personnel consulted for treatment recommendations by the inexperienced and unsupervised physicians (e.g. Dr. Uyemura, Hoti, *et al*), were two clinical pharmacists, Sean Reilly and Ngo Hoa Le; not the Baylor physicians specialists/professors that are paid and are on contract to be present and instruct, supervise, take over, etc.

65. Ms. Ngo Le, the first clinical pharmacist, came in on 3/5/2015 at 10:47am and tried doing what a hematology/oncology physician should be doing.  There is no evidence that Ngo Le even examined Decedent.  She noted the obvious/likely communicated AML issue, noted hypertension, and noted a congestive heart issue; yet recommended to "Monitor Renal Function."  Yet, Decedent had no renal (kidney) issues at this time.

66. The second clinical pharmacist, Sean Reilly, also came in subsequently at 12:14pm on 3/5/2015 and also tried what a specialized physician should be doing.  He actually examined Decedent, noted that Decedent was not anxious or depressed, noted mildly

enlarged lymph nodes, noted that his kidneys were "unremarkably" fine, and noted a right ventricle (heart) pressure overload.

67. Decedent's kidneys were "unremarkable" per Mr. Reilly's review of Decedent's renal (kidney) ultrasound report.  According to Mr. Reilly, there was "No sonographic findings to suggest medical renal disease."  Yet, Mr. Reilley made a drug-related high-dosage (300mg) recommendation for Allopurinol, a medication that is used to treat kidney stones.

68. Allopurinol is a medication with serious side effects that should not without consulting a licensed physician if a patient has, amongst others, congestive heart failure.

69. Mr. Reilly even instructed the physicians in writing, "**Please do NOT dose reduce the Allopurinol for renal impairment**."

70. Mr. Reilly clearly did not know what he was doing, because on 3/6/2015 at 12:03pm, Dr. Jingyin Yan wrote, " AKI per AML… HUS-TTP.edema. **Discussed with hemonc team**, no schistocytes were seen in peripheral smear, **so this is not respiratory failure**. He needs hypotonic fluid for hypernatremia. Lasix as needed for pulmonary acid nephropathy. **Please adjust allopurinol dose per renal function**. Agree with intubation for yesterday in urine sediment, which is absent in the urine sediment today, indicating that he has uricand plan: s/p rasburicase yesterday. Uric acid level is improving. We saw a lot of uric acid crystal."

71. Hence Decedent **had** acute renal/kidney issues from his AML, and his issue was **not** respiratory failure.  Furthermore, the high dose of Allopurinol was improperly ordered and administered by the non-doctor, Mr. Reilley.

72. There is highly questionable evidence that an experienced hematology/oncology physician Dr. Weei-Chin Lin was supposedly consulted and spoke to Decedent.  According to Dr. Lin,

"This morning (before he was intubated), we spent quite sometime to communicate with him. While the communication was difficult due to his BiPAP and respiratory distress, we also suggest to discuss with his son, he insisted to converse with us without deferring to his son (since his son is still in Nigeria and will come to Houston next week), **and he expressed his interest in seeking further chemotherapy for AML relapse**..."

73. Interestingly, Dr. Lin's statement was signed on 3/6/2015 4:16 PM after the incident, and **written with Dr. Jianbo Wang's record access account.** Red flag & cover-up.

74. Regardless, most importantly, it's clear that Decedent was asking for chemotherapy and never consented to a bronchoscopy or anything else. The man wanted chemotherapy.

75. Basically, due to Decedent being in the hand of a bunch of inexperienced, untrained, unstaffed, and some unlicensed personnel, he was administered a high dosage of a medicine that he did not need, and that further injured him. The AML was not treated. Decedent was a guinea pig in an unstaffed, unequipped, and inexperienced hospital/medical team; while the attending staff physicians who are paid and contractually required to be present overseeing the residents and fellows were nowhere to be found.

76. No reasonably qualified physicians such as a Pulmonary (lung) specialist, an Ear, Nose, and Throat specialist, or even the suggested Hematology/Oncology that focuses on blood/cancer, was involved to confirm the need for a bronchoscopy to treat the AML or respiratory matter.

77. Nonetheless, on the morning of 3/6/15 the MICU team decided to proceed with the bronchoscopy. The clinical judgment was based on the fact that the MICU team felt that Decedent was under severe respiratory compromise.

Now this is where the questions begin:

78. Did he really need the bronchoscopy? Absolutely not. For those that are unaware a bronchoscopy is an invasive procedure that visualizes a person's trachea or windpipe. It can be used for both diagnosing and treating respiratory conditions. In the case of Decedent, performing a bronchoscopy was of no therapeutic value and would NOT have changed his diagnosis.

79. To reiterate, the medical team was charged to determine what was causing Decedent's respiratory difficulties. The two leading causes were either 1) a lung infection, which he was already being treated with antibiotics or 2) his leukemia. The evidence gathered earlier in Decedent's work-up already pointed to a relapse in Decedent's AML, a fact that the medical team was well aware of.  Since the team was keen enough to start Decedent on antibiotics for presumed lung infections, he also should have been started on chemotherapy right away for his AML instead of being subject to unnecessary ELECTIVE procedures.

80. Moreover, any lung specialist would agree that the number one contraindication to performing a NONEMERGENT, ELECTIVE bronchoscopy are certain lung and heart conditions including severe respiratory failure. Now as the medical team may have it, if their clinical impression was that Decedent was suffering from hypoxemia and severe respiratory compromise, why even think to perform a bronchoscopy if it was NOT going to change the overall management of the patient?  Again, these physicians did not want to give him chemotherapy mainly because of the color of his skin, his once foreigner/alien status, and due to their own personal vendetta against him.

81. It should also be noted that as part of the bronchoscopy procedure, a patient would have to be adequately sedated with anesthetics as to not feel pain and discomfort from the procedure. In the first bronchoscopy conducted by Dr. Amit on December 19, 2013, Decedent was properly sedated with anesthesia.  In the March 6, 2015 bronchoscopy procedure, there is evidence that Decedent was not properly sedated.

82. Sedation itself naturally causes ones respiratory drive to decrease.  So again, why did the medical team agree and decide for a bronchoscopy to be done on a patient that they stated to be in respiratory failure?  Decedent needed prompt evaluation by a cancer specialist and initiation of chemotherapy, and NOT to be experimented on by inexperienced health professionals.  But again, after his first treatment at the hospital in December 2013, the medical staff already felt he did not have any money.  So they were not willing to provide experienced professionals to attend to Decedent.

83. Factually speaking, Dr. Sarkar, Pulmonary Care, Critical Care, and Sleep Medicine physician stated on 3/24/2015 that he had "intermittent hypotension," and that Decedent was found to have acute renal failure at admission.  Ngo Le, the pharmacist, also stated that he had hypertension, and said to monitor the kidneys.  Meanwhile Sean Reilly claimed that his kidneys were "unremarkably" fine.  There is no record of Dr. Sarkar ever seeing, attending to, or being involved with Decedent until after the botched tracheostomy.

84. Medical professionals (i.e. physicians) actually disagree because as documented in Decedent's medical records by Dr. Atur Sheth, at 3/5/2015 at 12:32AM, Decedent was able to communicate and give consent for the bronchoscopy treatment.  Dr. Sheth stated,

"Patient was ok with intubation and is full code.  Have informed sister-in-law of likely intubation."

85. Interestingly, there is no valid copy of said consent in the medical records.  The signatures alleged to be that of Decedent are in "Exhibit M" are disputed and unrecognized by Family-Plaintiffs, and is a forged document per the expert report on file as of 3/11/2016.  Family does not know of any such alleged sister-in-law of decedent.  Decedent has no sister in law.  He has a daughter-in-law who is mentioned in the records.  Yet such daughter-in-law did not receive a call regarding an anticipated bronchoscopy nor did she consent to such treatment for Decedent.  The forged document was also secured criminally in violation of Texas Penal Code 32.46.  The execution of the document was secured through deception with intent to defraud and/or harm Plaintiffs.  It's proof lies in the **unsigned** "bronchoscopy w/ bronchial alveolar lavage" procedure report dated 3/9/2015 (Exhibit G), after the 3/6/2015 bronchoscopy and tracheostomy traumatic incident.  It describes a bronchoscopy w/ bronchial alveolar lavage procedure done on 3/9/2015 at 9:45am, with the physician as Dr. Elizabeth Guy, and with Van Hoang as the Assisting MD/Fellow.  This is another criminally forged document, as it does not bear the required electronic signature as others (Exhibit H).  Someone typed in Elizabeth Guy's name and did not electronically sign it at the bottom as required and as done by Dr. Amit Parulekar.

86. After the 3/6/2015 botched bronchoscopy and tracheostomy incident, and with Decedent in such a state, any bronchoscopy w/ bronchial alveolar lavage procedure on Decedent is not only unnecessary but unconscionable.  And it was also done without consent, as a

cover-up to the botched 3/6/2015 bronchoscopy.  Furthermore, the 3/9/2015 document was unsigned.  Hence there is no proof that Dr. Guy was present.

87. Regardless, the consent form also bears no witness as required and shown in the other consent forms, and as required by hospital and Harris Health district policy.  It also states that the consent was signed at 10:10am for consent to an "endotracheal intubation, bronchoscopy with bronchial alveolar lavage, biopsy, and other interventions."  The respiratory failure event occurred about two hours after around 12:20pm on said March 6, 2015.

88. Other consent forms bear his family member confirmed signature, as well as signatures of witnesses.    The consent form also says that Dr. Guy was to do a tracheotomy.  Meanwhile Dr. Guy statement in the medical records states that Dr. Hoang did the bronchoscopy, and Dr. Kwak confirmed that he did the tracheotomy.  Exhibit M, hereby incorporated by reference, is a fraudulent document.

89. Interestingly, per the medical records, the bronchoscopy was the only discussed procedure before the March 6, 2015 respiratory failure that occurred about two hours after around 12:20pm.  Per the medical records, Dr. Kwak, Nurse Railey, Mimi Phan, etc., the decision for endotracheal intubation was made as an emergency after Decedent already experienced severe oxygen loss as a result of the undisclosed botched bronchoscopy attempt.  The Bronchial alveolar lavage decision only appears in the forged 3/6/2015 document and in the handwritten code sheet regarding the tracheostomy. Therefore, Decedent would *NOT* have been able to consent to an endotracheal intubation as he was incapacitated; unless Defendants doped him up and had him execute the

document right before the emergency tracheostomy.  In that case the March 6, 2015 bronchoscopy consent document is *still* forged as it was back-time stamped/written to indicate 10:10am and not the time when the tracheostomy occurred.  And it tells a worse story that Defendants intentionally, knowingly, and/or maliciously had an incapacitated man execute a document that contained false information against his interest and the interest of justice.

90. Moreover, it was documented that pre-procedure, Decedent was alert and orientated, answering and asking appropriate questions by the doctors and nurses. Given these facts, does this coincide with someone who the doctors claim to be in respiratory failure and in dire need of intubation and BAL? The answer is NO.

91. But what tops it all is that on page 507 of the medical records, it is documented that Decedent's oxygen saturation is 92% at the start on the intubation procedure which is an acceptable level.  However as mentioned above with the steps in a bronchoscopy procedure, prior to intubation Decedent would also require moderate sedation with drugs known to cause further respiratory depression and compromise.

92. Therefore with the mindset that Decedent was black, was a foreigner from Nigeria, and with no money (e.g. insurance coverage) the physicians and staff Defendants felt Decedent had no rights and treated him as such.

93. Even the medical records show that the staff was with full knowledge that Decedent had money to pay, and that he was "African American" as decedent became a permanent U.S. resident (Green Card holder) in later 2014.  Yet, the physicians and staff still used him as a guinea pig and treated him as subhuman.

94. All this occurred in Medical Intensive Care Unit of a Level I trauma teaching hospital – the highest possible level designation and which means that Patients have access to specialist medical and nursing care including emergency medicine, trauma surgery, critical care, neurosurgery, orthopedic surgery, anesthesiology and radiology, as well as highly sophisticated surgical and diagnostic equipment – where there are TONS of physicians and medical staff for each specialized area present, or required to be present at all times. Rather, it was incompetent physicians and/or unqualified and/or criminal minded physicians and staff assigned to conduct unnecessary high-risk procedures on Decedent without consent.

95. An inexperienced, unqualified, unstaffed, and unsupervised medical team seeking professional experience and cost savings, forged a consent document for an unnecessary bronchoscopy, and decided to proceed with an unnecessary high-risk and mortally wounding invasion of Decedent's body.

96. Inclusive of the qualified physicians and staff, Defendants acted amongst others, willfully wrongful, knowingly, maliciously, and/or with conscious indifference or reckless disregard to the rights, life, and safety of Plaintiffs. Decedent was their guinea pig.

97. As a result of a botched bronchoscopy attempted with a forged consent form, Decedent was losing oxygen and an emergency tracheostomy was done during which per the records Decedent's oxygen saturation deteriorated to the 80's, then the 70's, then the 50's, ultimately leading to the code, i.e. a comatose patient, multi-organ failure.

98. The evidence shows that Decedent did not need the intubation/bronchoscopy. He needed chemotherapy.  But instead of the staff treating him with chemo, they decided to experiment on their guinea pig, Decedent.

99. A bronchoscopy is a procedure in which a 2 inch diameter and about 4 in length device is inserted into a person, then a fiber optic tube with a camera in the end is then inserted into the device, and passed through the patient's insides to view the internal organs (e.g. lungs).

100.     This is a high-risk procedure that should never be done without proper precautions, preparations, trained staff, and most of all, without written and signed consent from patient or authorized persons (e.g. family) as per Exhibit P.

101.     Another point is as documented in the medical records, even after putting Decedent in the worst shape possible, comatose and lifeless, the medical team (including Dr. Guy and Dr. Hoang; Dr. Hoang being the same person that participated in the botched bronchoscopy and Dr. Phan being the person that botched the tracheostomy) still proceeded with a bronchoalveolar lavage/flexible bronchoscopy.

102.     In other words, Defendants (Dr. Elizabeth Guy and Van Hoang) still performed a high-risk invasive procedure within three days after the terrible event (on 3/9/2015), on a critically ill and mortally wounded patient. There are many things unethically wrong with this.

103.     First of all, pursuant to the attached published report from the National Institute of Health, "In patients with hematological malignancy (HM) developing acute respiratory failure (ARF) bronchoalveolar lavage (BAL) is considered as a major diagnostic tool.

However, the benefit/risk ratio of this invasive procedure is probably lower in the subset of patients with acute myeloid leukemia (AML)."

104.     Most importantly, per the cytology report, the results of the cell specimens obtained from Decedent's after bronchoalveolar lavage or the 3/9/2015 flexible bronchoscopy were **negative for malignant** cells just as before.  The original botched bronchoscopy and 3/9/2015 bronchoalveolar lavage/flexible bronchoscopy were again, **unnecessary**.

105.     Decedent was merely a guinea pig for experimental purposes, and Defendants' benefit was experience for the physicians, cost savings for the entities, and reimbursement funds from the government.

<u>Pertinent details as to the second hospital visit</u>

106.     Per Decedent's medical records, on March 6, 2015, two "respiratory/anesthesiology" trained medical personnel and/or physicians conducted the intubation unsuccessfully during which Decedent' heart stopped, he sustained cardiopulmonary arrest, was "suffocated and died."

107.     When Decedent's son arrived at Ben Taub from a trip to Nigeria on 3/12/2015, he headed straight to his hospital bedside from the airport only to find that the alert and oriented individual he left in the hands of the physicians, was now on life support; with tubes all over him; bloodied up in his nose, ears, and mouth, and in the intensive care unit (6E room 11).  He took pictures and began to question the staff as to what had happened.

108.     Dr. Sarkar, the attending physician at this time explained to him that his father was placed on BIPAP (oxygen mask) for two days shortly after he was admitted; that his

father's sputum cultures were negative and so they decided to further assess his lungs by performing a bronchoscopy on 03/06 which required that he'd be intubated first. Dr. Sarkar stated that they obtained written consent from Decedent. (Note again: no valid written consent has been provided.)

109.     Per Dr. Sarkar, attempts were made to resuscitate Dr. for 30 minutes. Due to the length of time taken to bring him back he suffered extensive anoxic brain injury, kidney failure, respiratory failure, and digestive failure.

110.     A nurse informed Decedent's son that on the day of the bronchoscopy, Decedent was "chatting it up" with them until the bronchoscopy procedure begun on March 6. Hence, Decedent was not properly sedated prior to the botched bronchoscopy.

111.     The multiple organ failure directly resulted in Decedent dependence on ventilator support (following an emergency tracheotomy performed by ENT), dialysis support and GI tube feeding.

112.     Decedent later regained organ functions but suffered severe brain injury due to the loss of oxygen.  However, following the March 6, 2015 botched bronchoscopy and tracheostomy, as well as the March 9, 2015 bronchoalveolar lavage, decedent was not in a vegetative state.  He was just severely or mortally injured.

Dr. Elizabeth Guy

113.     A Dr. Elizabeth S. Guy, MD authored the primary care case management procedure note for the intubation/bronchoscopy **post** the tracheostomy and multiple organ failure.  She indicates that the operator of the endotracheal intubation is Dr. V.

Hoang, MD (i.e. Dr. Van VI. Hoang, Resident MD in Pulmonary/Critical Care PGY-4), while she, i.e. Dr. Elizabeth Guy, was the supervising physician.

114.     Dr. Guy also stated that Decedent had respiratory failure and bilateral pneumonia.

115.     It's worth noting that Dr. Guy's entry in the records was written at 3:16pm on 3/6/2015, after the emergency tracheostomy.   The tracheostomy procedure occurred around 12:20 – 12:40pm on 3/6/2015.   Dr. Guy has been a fully licensed physician practicing since 1999.

116.     Dr. Guy claims, "Consent was obtained."     Yet there is no consent for a bronchoscopy.  There is a *forged* consent Van Hoang signed for a 3/6/2015 bronchoscopy, which states that Dr. Guy was allegedly the bronchoscopy physician.  There are no details of a bronchoscopy that occurred on 3/6/2015 as per the dated forged consent **allegedly signed at 10:10am**.  And according to nurse Eke, Decedent was "chatting it up" with the staff until he was wheeled into the room for the alleged 3/6/2015 bronchoscopy procedure.

117.     According to Dr. Guy, "a size 8 ETT (endotracheal tube) was attempted to advance but was not in the trachea."  Here Dr. Guy is discussing the emergency tracheostomy, not a bronchoscopy.

118.     There is no entry statement in the medical records from Van Hoang in Decedent's medical records about her involvement in the 3/6/2015 bronchoscopy that led to the emergency tracheostomy.

119.   There is no entry statement in the medical records from any reasonably qualified and licensed physician about authorizing, prepping for, or executing the 3/6/2015 bronchoscopy that is time stamped before the 3/6/2015 emergency tracheostomy.

120.   Many of the statements in the medical records regarding the March 6, 2015 incident (bronchoscopy and tracheostomy) are hours after the fact, with conflicting and missing statements from important individuals that were or should have been present to authorize, supervise, or participate in the bronchoscopy or tracheostomy.

121.   There is clear proof of a cover up, lack of experience, lack of supervision, and knowingly violating the law, amongst others.

Paul Edward Kwak's version of the 3/6/2015 incident

122.   Dr. Veronica Vittone, Resident MD's notes indicated that Dr. Guy was the bronchoscopy/intubation physician on 3/6/2015.  Dr. Veronica Vittone, on 7/8/2015, cites to Dr. Guy's update note at 5:04pm on 3/6/2015 stating, "a size 8 ETT (endotracheal tube) was attempted to advance but was not in the trachea."  In other words, even though this experimental procedure on their guinea pig was clearly unnecessary, they did not know what they were doing as the endotracheal tube was not properly inserted into the trachea.  Dr. Guy is an MICU physician with years of experience.

123.   Regardless, the misplacement of the endotracheal tube led to Dr. Aphaeus' loss of oxygen with "oxygen saturations hovered in the 40s-50s" (a deadly rate) per the ENT note by Dr. Paul Kwak, Senior ENT Resident on pg 24457 of the medical records.

124.   Furthermore, Dr. Vittone's Progress Notes cites the 3/6/2015 ENT note by Dr. Paul Kwak, who stated, "A direct laryngoscopy and oral endotracheal intubation were

attempted by the anesthesia team but the airway could not be established.  Oxygen saturations hovered in the 40s-50s.  A vertical incision was made in the skin of the anterior neck with a #11-blade scapel.  Significant amounts of soft tissue and fat were incised with the 11-blade to the presumed level of the trachea, but no lumen was found despite attempts to use the Bougie and flexible bronchoscope.  The trachea was again palpated and medialzed, then incised horizontally with the 11-blade."

125.     In other words, while the physicians were playing a guessing game (i.e. presumed) on their Decedent's trachea in an unnecessary high-risk procedure, Decedent lost an extreme amount of oxygen, and the physicians could not find the trachea lumen and were not able to place the tube in Decedent' trachea to oxygenate him.  Eventually, someone palpated, medialized and stabilized the trachea tube, and so was then able to pass the tracheotomy tube that was connected to oxygen.  The physicians finally were able to connect the Decedent to oxygen.  All along, during the "presuming and guessing interim," Decedent was starved of oxygen.

Nurse Raichel Elan Hailey, RN's version

126.     Nurse Raichel Elan Hailey, RN, disclosed her report made at 3/6/2015 at 7:39pm – pg. 25952 of Decedent' Ben Taub medical records – that "patient received anxious on BIPAP 60% FiO2… Intubation and bronchoscopy unsuccessfully attempted this shift by MICU team, MD Guy and MD Guerra, and anesthesia, ultimately emergent tracheotomy at bedside by ENT performed. Patient bradycardic and atropine administered.  Patient PEA following tracheotomy at 12:26, CPR initiated and ACLS protocol followed.  Patient

ROSC achieved at 12:38.  Right radial arterial line and right femoral CVC placed by team.

Currently patient not responsive… no movement to pain… fighting vent."

127.     First of all, the names anesthesia team personnel that were evidently present

during the 3/6/2015 procedure are not mentioned in the records.  There are no reports

from said anesthesia team regarding the incident.  Were they even there? Also note that

Nurse Hailey's statement is given at 7:39pm, while the event occurred around 12:20pm

through 12:40pm.  Dr. Guerra has been a fully licensed physician since April 2012, and is

an assistant professor at Baylor College of Medicine.

128.     Regardless, Decedent was so far gone/near death due to loss of oxygen because

of the failed presumption of his trachea by the unnamed MICU team, Dr. Guy, Guerra,

and the unnamed anesthesiologists, and without these physicians assuring the proper

location and stabilizing the trachea before passing the endotracheal tube (ET) into

Decedent's throat.

129.     Furthermore, it is no surprise that being lightly sedated for this high-risk invasive

procedure that normally required significant anesthesia, undergoing a procedure by

medical personnel who rather seemed to be speculating instead of verifying the

anatomical position of Decedent's trachea as required, and under unbearable pain,

cardiac arrest, and brain anoxia due to the wrongfully placed the ET tube outside the

trachea, that Decedent was reflexively and involuntarily fighting the vent under

frustration, hopelessness, and helplessness (i.e. he "pulled out the tube" unconsciously

"fighting vent:" a reflex/instinctive reaction like a headless chicken or reptile).  Again, the

fighting vent shows that he was not well sedated or oxygenated.

130.     A Dr. Suman Rajagopalan, MD of Ben Taub's Bt 6emi Mdcl Icu department was the care provider on 3/6/2015 per pg. 25998 of the medical records, and oversees the anesthesiology department.

131.     These physicians mortally wounded Decedent by *amongst others*, recklessly, intentionally, or knowingly, putting him under intense pain and suffering.  They were passing the ET blindly, and he was not provided proper oxygen or anesthesia for or during the procedure.  One can only wonder Decedent's level of trauma sustained at the hands of the physicians as they put him into brain anoxia, cardiac arrest, and multiple organ failure.

### Addition to the 3/6/2015 incident

132.     Per Dr. Kwak's notes on pg. 475, he performed the tracheotomy and presumed the level of the trachea.  Dr. Susan A. Eicher, MD, signed off on his presumptions and activities, per her "Teaching Physician Addendum" on page 476 of Decedent' Ben Taub hospital records.  Yet, the outstanding question is whether Dr. Paul E. Kwak, a Senior Resident, conducted the procedure in front of the Attending Physician Dr. Susan A. Eicher, MD, or in front of Dr. Guerra as indicated by Ms. Raichel Elan Hailey.  Dr. Eicher claims that she interviewed Decedent before the tracheotomy around 1:21pm.  Yet at 1:17pm, Dr. Kwak was describing the failure of the tracheotomy because it had already occurred.

133.     After further discovery, there exists a handwritten sheet signed by Elan Hailey RN and Thankamma Macadden, RN at 7pm on 3/6/2015 (Exhibit Y).  It states an "emergency tracheostomy by ENT surgeon after an unsuccessful intubation…"  It states that Paul Kwak was the physician who performed the intubation.  It states that a Dr. Guerra was the

attending physician in charge.  It also states that Herber Ortiz, RN, Elan Hailey, RN, Thankamma Macaden, RN, Elizabeth Guy MD, Diana Guerra MD, Mimi Phan MD, Veeral Mehta MD, Rajagopalan MD, Suresh Manickvel MD, Lamaya Blair RT, and **another Herbert Ortiz RN** were there for the tracheostomy.  There are many issues with this document, and evidence that it contains false information.

134.     First of all, if all these competent hands were on deck for the emergency tracheosctomy, then why was an incompetent fellow who "presumed to position of the trachea" allowed to operate in such an emergency?  It is further evidence that Decedent was merely a guinea pig for experiment purposes.

135.     Decedent sustained sever wounds from the tracheostomy tube placement.  As of 3/28/2015, per Dr. Kao, the trachea site developed ulcers.  Per Dr. Winograd's physical exam notes on 3/28/2015, Decedent had dry blood in his mouth.

136.     There is further evidence per the medical records that there was additional issues and damages caused with the tracheostomy tube as it subsequently had to be replaced; meanwhile Decedent was without proper oxygen, bleeding internally, and getting multiple catheters recklessly inserted into his left and right jugular without proper oversight or experienced physician- and many of such catheters did not function properly either.

137.     Furthermore, why list Herbert Ortiz RN again in "Other" category in the same page of the documents just lines after writing his name as the "Nurse Supervisor" category? This shows the state of mind of the nurses attempting to cover up for the physicians and themselves.

138.     Also, included in the falsified Code sheet is a statement from Mimi Phan.  Mimi

stated that there was difficult airway in several attempts to intubate Decedent.  There

was then a bedside emergency tracheostomy attempted.  The first was unsuccessful, the

second was successful.  Throughout the event, patient was hypoxic.  Dr. Guerra was in

charge.

139.     Now if Dr. Guerra was in charge, why allow incompetent hands to do a high-risk

emergency procedure under such conditions?  After the botched bronchoscopy, leading

to the need for the alleged emergence tracheostomy, that was the moment all seasoned

experts should have taken over and not allow inexperienced and incompetent physicians.

140.     Furthermore, there exists a modern and sophisticated video monitoring camera

on the wall of the room where the event occurred.  Plaintiffs requested for the recording

of the camera.  According to Dr. Fisher at the ethics board meeting in July 2015, the

recording does not exist.  According to Harris Health, the **modern and sophisticated**

surveillance camera does not work.

<u>Other Injuries</u>

1.  Decedent sustained severe lacerations, which the medical records list as "pressure ulcer

blisters," to both his left and right ear and other parts of his body, as a result of bed sores

that Defendants intentionally allowed to develop to sever stages.  The photos taken from the

medical records by Nurse(s) Barbara Lynn Manning, Elaine, Bennett, Santos, and Eke of the

severe injuries sustained by Decedent.

2.  Per the photos, Defendants intentionally or recklessly neglected Decedent for months as

sever condition bedsores developed throughout his body from mid-March 2015 to July 2015.

Bed Sores/Signs of Malicious, Knowing, or Intentional Elderly Abuse by Defendants

3. The ear injuries or bedsores were eventually first assessed on 3/10/2015 per pg 5565 of his medical records.  Per the records, no dressings of the ulcers were ordered.  The injuries were left "open to air" per the nurse's report.  In other words, an open would left undressed.  After mortally wounding and committing aggravated assault on Decedent, Defendants left him to rot away like a guinea pig with no further benefit to them.

4. Decedent also sustained unstageable pressure ulcers to his right buttocks.  These were first assessed on 5/22/2015.

5. Decedent also sustained anterior positioned lacerations to his scrotum.  Nurse Elaine Manning first noted these on 4/2/2015 at 12:55pm. Per the medical records pg 5565, this was first assessed on 6/15/2015.

6. Decedent also sustained lacerations to his penis.  The penis ulcer, per pg 4492 of the medical records, were first assessed on 6/15/2015.  However, the first photo of the penis ulcer per Nurse Manning's photo entry was 4/23/2015 at 11:59am.

7. Decedent also sustained lacerations to his left lower leg.  Nurses Bennett, Eke, Santos, and Manning first disclosed these on 4/30/2015.

8. Photos of the ear ulcers taken on 5/21/2015 shows that the ear injuries were finally dressed and covered.  These ulcers developed on or about 3/10/2015.

9. The fifth sets of photos of Decedent's injuries taken by Nurse Manning were on 6/03/2015 at 8:09am.  This is only of his left ear.

10. The sixth sets of photos of Decedent's injuries taken by Nurse Manning were on 6/10/2015 at 7:22am.  They included the buttocks, and left and right ear injuries.

11. The seventh sets of photos of Decedent's injuries taken by Nurse Manning were on 7/2/2015 at 2:53pm.  They included the buttocks, left and right ears, and penis laceration injuries.

12. The eight set of photos of Decedent's ulcers were taken by Elaine Ibanez Santos on 7/15/2015 at 1:45pm.  It included the penis laceration injury, some of the scrotum injury, and the buttocks injury.

13. The ninth set of photos of Decedent's injuries were taken by Elaine Ibanez Santos on 7/23/2015 at 7:04am.  It included the buttocks, left and right ears, and penis laceration injuries.

14. Per the medical records, the first physician to mention the severe skin ulcers in her physician notes was Dr. Winograd on 3/28/2015.  The first was photo'd by the nurse Manning on 3/10/2015 as said ulcer was left to "open air."  Meanwhile in the interim, multiple physician Defendants "physically examined" Decedent.

15. The later disclosures are more evidence that Defendants, *amongst others*, recklessly, maliciously, intentionally, knowingly, left Decedent to rot away.  However, by 5/22/2015, it was evident that his family was not going to succumb to the pressures of Defendants.  So they had to at least doing something, and in order to cover up their wrongful actions.

Vegetative State Issues and Additional Events after the March 6. 2015 incident

16. Mimi Phan and Van Hoang did a Quentin Catheter placement on Decedent on or about 3/10/2015 "**in anticipation of HD**" (i.e. Hemodialysis).  It was inserted into his "right internal jugular vein."  Dr. Sarkar was supposed to be present to oversee this procedure.  He was not.

17. Per Robert De Silva, RN at 4:35pm on 3/10/2015 after the catheter placement, Nurse De Silva was "Unable to dialyze patient, **HD catheter not working**, unable to aspirate both ports. Dr Hothi and ICU MD team notified."

18. According to Dr. Brian M. Zwecker (Nephrology fellow), as of 3/15/2015, 3/16/2015, and 3/25/2015, Decedent's "catheter was not functioning well…"

19. Evidently, per Xiaoming Jia's entry in the medical records- pg 24331 – Decedent was even bleeding from his treachea the night of 3/11/2015.

20. Bethrand will testify that when he arrived at Ben Taub Hospital on 3/12/2015 and saw his father, he met Dr. Sarkar in the hospital.  After Dr. Sarkar told Bethrand his version of the 3/6/2015 event, Dr. Sarkar told Bethrand to "just forget about him" (i.e. forget about his father, Decedent).  To which Bethrand replied that his father needs to remain in full code (i.e. full treatment), and that a lot of people both here and in Nigeria were depending on Decedent being alive.

21. Other catheter placement issues:

    a) R Fem Central line 3/9/15. Suresh Kumar Manikavel (fellow MD) was the physician who did the procedure.  Dr. Elizabeth Guy claimed that she was partly "present" (i.e. there for insertion and left.  Later returned.)  This catheter placement was removed/discontinued on 3/18.

    b) R Quentin catheter on 3/10/15 done by Mimi Phan & Van Hoang on Decedent's right internal jugular vein (neck area).  Sarkar was supposed to be the overseeing attending physicians. He was not present but stated that he was "available."  The catheter was later found to be improperly placed and had to be redone/revised on 3/11/15 as it was causing further sever injury to Decedent.  It was discontinued on 3/16.

    c) L Quentin catheter insertion in Decedent's left internal jugular vein (neck area) by Dr. Christina Kao on 3/16/15; found to be clogged on 3/25; and discontinued 3/26.

d)  R Internal Jugular vein central line catheter placement done on 3/18/15 by Van Hoang. According to Van Hoang, Sarkar was present.  Only 1 of 3 ports working as of 3/25/15; removed on 4/10.

e)  R femoral Quentin Catheter placement on 3/26/15 by Dr. Venkata Bandi; clogged as of 3/30/15.

f)  L Internal jugular vein Quentin catheter placement again on 3/31/15 Van Hoang.  Sarkar alleged to be Present.  Dr. Sarkar only co-signed Van Hoang's notes regarding this procedure.

22. After the 3/6/2015 incident, Decedent regained some function but still had kidney/renal issues, had bowel movements on tube feeds, and respiratory function with ventilator support.  However, according to conflicting medical record reports he was either (a) fully awake or (b) his brain function was still minimal, or (c) his kidneys were worsening.  This makes no sense. The medical records sometimes stated that he had pain reflexes on occasions and eye movement but still unresponsive to commands; and other times it stated that he was fully awake or communicating and giving consent to treatment.

23. As of 3/8/2015, per Dr. Winograd, Decedent was taken off sedation and pressors (a life-sustaining treatment), while his kidneys were worsening.

24. For example, on 4/18/2015 at 2:46pm, Nurse Tochukwu B Onyekwelu wrote that "Air detector in the line, attempted to flush but not able, called dialysis nurse Robert who told me to stop the dialysis and blood was returned back.  Patient was stable, no apparent respiratory distress.

25. Per the medical records, Decedent was not in a persistent vegetative state until 7/10/2015. Yet Defendants were forcing the family to authorize withholding of life-sustaining treatment as of March 2015; were executing their DNR proceedings as of later March and early April

2015; and were writing of their pre-determined conclusion or agreement to DNR Decedent in Decedent's records as of the last week of March 2015.  As of the morning of 4/18/2015, per Dr. Kalpalatha Guntupalli he was "weaned … off pressors."

26. Pressors is one of the life-sustaining treatment later suggested to be withheld from Decedent by Harris Health System ethics board.

27. On 3/31/2015 and as a result of the injury sustained at the hand of Ben Taub Hospital physicians since his admission to the hospital, Dr. Jianbo Wang, MD, a Hematology Fellow, disclosed in Decedent' Ben Taub medical records, "Neurology staff indicates patient has no chance of meaningful neurological recovery and that he is going to enter vegetative and minimal conscious state."

28. On 4/16/2015, Decedent's son Bethrand visited his father and video recorded Decedent crying and moving his shoulders in response to Bethrand's communications to him about his injury.  However, Decedent was unable to verbally communicate back likely due to the brain injury sustained. This video has been provided to Baylor and Harris Health via their counsel.

29. One will notice that while the elderly man Defendants mortally wounded was crying due to his injury, Defendants were already plotting to DNR him against his and his family's wishes.

30. On 5/10/2015 and 5/13/2015, Dr. Santiago N. Lopez under the authorization of Dr. Elizabeth Guy wrote that Decedent was in a persistent vegetative state due to anoxic brain injury.

31. On 5/21/2015, Dr. Diana M. Guerra, Assistant Professor Pulmonary and Critical Care at Baylor College of Medicine confirmed Decedent' vegetative state, at 12:11pm in Decedent' Ben Taub medical records and on page 24,832.  This was false because Decedent was not in a persistent vegetative state until 7/10/2015.

32. On 5/22/2015 at 8:15am, Dr. Elizabeth Guy wrote in the Pulmonary Attending Physician Note, "A/P… persistent vegetative state."  Again, this was false because Decedent was not in a persistent vegetative state until 7/10/2015.

33. On 5/23/2015, at 9:38AM, page 24813 of Decedent' Ben Taub medical records, Dr. Stephen R. Bujarski, Fellow, Pulmonary Attending Physician, wrote, "…anoxic brain injury, vegetative status."  Again, this was false because Decedent was not in a persistent vegetative state until 7/10/2015.  Prior to 7/10/2015 Decedent was at worst in a minimally conscious state, or at best in a state of awareness.

34. On 5/26/2015 at 10:15am, Dr. Elizabeth Guy wrote that Dr. Ohawkeh was in a "persistent vegetative state" in her pulmonary attending physician notes.  Another lie.

35. On 6/1/2015 at 1:18pm, a social worker by the name Vinny Oommen wrote in his discharge care coordination plan, "…primary team is also consulting ethics committee for futility of care in a pt with persistent vegetative state." Pt. means "patient."

36. According to Mr. Oommen, the family was not willing to pay for Decedent's transfer nor did they want Decedent transferred.  Also according to Mr. Oommen, Decedent did not qualify for insurance.  Note: Decedent suffered kidney failure and was above 65yrs old.

Vinny Ommenn and the Harris Health Social Worker Staff's wrongful involvement

37. Approximately over the months of April, May, and/or June, Bethrand received numerous harassing telephone calls and voice mails from the Hosptial social worker, Ms. Vinny Ommenn and her team.  Ms. Ommenn wanted Bethrand to sign documents that would enable Decedent's hospital bills to be covered by Medicaid.  When Bethrand arrived read the fine print in the documents, the fine print said that Texas Medicaid Recovery Act allowed the

Hospital to go after the responsible party's estate.  The document also had no indication of the amount of the hospital bill in question.

38. Bethrand inquired as to the meaning and effect of the clause allowing the Hospital to pursue claims against Decedent's estate.  According to Bethrand, Vinny Ommenn and her staff kept "dogging the question."

39. Bethrand then felt suspicious and did not sign the document because (1) the physicians and staff were still misrepresenting the facts regarding the cause of Decedent's injuries, his condition, etc.; and (2) Vinny Ommenn and her staff were dogging the Texas Medicaid Recovery Act question he presented.

40. In effect, and legally speaking had Bethrand executed the document, execution of the document meant accepting liability for the debt, and solid evidence of agreeing to the non-liability of Defendants for Plaintiffs' sustained injuries.

41. Vinny Ommenn and her staff attempted another violation of Texas Penal Code 32.46, yet violated, *amongst others*, Federal and Texas debt collection laws.

Additional Facts Continued

42. On 6/11/2015, Tigist Mehari, Resident MD, wrote a progress note that exists on page 24621 of Dr. Aphaues' Ben Taub medical records, "… brain injury from prolonged cardiac arrest with resuscitation.  Cat Scan Impression Report on 4/15/2015."

43. On 6/23/2015, at 1:37pm, Dr. Joslyn Fisher also later wrote in his medical records, "…patient's terminal (and essentially irreversible) neurologic condition…"

44. On 6/30/2015 at 8:03am, Dr. Jared Lee wrote in the medical records, "…recent neuro exam with possible facial grimacing to painful stimuli in few areas of body, may reflect minimally

conscious state rather than persistent vegetative state but this does not change expected overall outcome (no hope for meaningful recovery); still with brain stem reflexes..."  Dr. Sudha Yarlagadda wrote the same in the medical records on 7/1/2015 at 1:46pm, on 7/2/2015 at 2:40pm, 7/3/2015 at 11:32am, and at 7/4/2015 at 8:53am.  Holly J. Bentz wrote the same on 6/27/2015 at 7:05am, and on 6/28/2015 at 7:21am.  Veronica Vittone wrote the same on 6/26/2015 at 2:54pm.

45. On 7/6/2015 at 5:47pm, Dr. Sudha Yarlagadda wrote in the medical records, "…recent neuro exam with possible facial grimacing to painful stimuli in few areas of body, may reflect minimally conscious state rather than persistent vegetative state but this does not significantly change expected overall outcomes (no hope for meaningful neurologic recovery); still with brainstem reflexes."   In the same notes under the Goals of Care/Placement, Dr. Sudha wrote, "…now patient is stable albeit still with poor prognosis from a neurological and heme/onc standpoint. No funding for LTAC."  LTAC means Long Term Acute Care.  Dr. Xandera signed off on Dr. Sudha's work on 7/7/2015 at 12:59am.

46. On 7/7/2015, Dr. Veronica Vittone at 7:05am wrote, "… now in persistent vegetative state vs. minimally conscious state."   Yet in the same records she wrote "…Still with minimal conscious state vs persistent vegetative state."  Dr. Wayne Xandera signed off on Vittone's assessment notes and findings at 10:34am.

47. On 7/8/2015 at 2:09pm, Dr. Sudha Yarlagadda wrote in the progress notes, "In past few weeks, patient has had minimal facial grimacing to painful stimuli in few areas of body, may reflect minimally conscious state rather than persistent vegetative state…" and "…Still with minimal conscious state vs persistent vegetative state."  Yet in the same progress notes Dr.

Sudha also wote in the assessment plan, "… now in persistent vegetative state vs. minimally conscious state." He also wrote "… overall outcome and prognosis does not change with PVS vs MCS." PVS means <u>persistent vegetative state</u>, while MCS means <u>minimally conscious state</u>.

48. On the same 7/8/2015 at 5:33pm, social worker by the name Vinny Oommen wrote a "Discharge Care Coordination" in the records and also wrote, "now in persistent vegetative state vs minimally conscious state… Patient does not have eligibility for funding."

49. Per Dr. Xandera writing on 7/8/2015 at 2:23pm, Dr. James Banfield at Baylor College of Medicine's Risk Management office was notified of Decedent's case.

50. On 7/8/2015 at 3:39pm, Nurse Rebecca Williams Clinical Case Manager wrote in her Flowsheet notes, "… now in persistent vegetative state vs. minimally conscious state… Disposition: Home when medically stable."

51. On 7/9/2015 at 8:10am, Dr. Sudha and Xandera authorized and requested a neurological consult for a "need for attending noted conscious vs. persistent vegetative state." On that same 7/9/2015 at 3:16pm, Dr. Lydia J. Sharp, MD, Neurologist, wrote in Decedent' Ben Taub medical records, "…3/6/2015 and has been unresponsive since. No improvement for past three months. No grimace… consistent with vegetative state." Contrary to Dr. Sudha's finding and in concert with the social worker's finding.

52. On 7/22/2015, Dr. Jesus H. Hermosillo, Fellow, wrote in pg. 67 of Decedent' Ben Taub medical records, "respiratory failure with difficult intubation, underwent emergent tracheotomy, had PEA (pulseless electrical activity) arrest and multi organ failure… anoxic brain injury… ventilator-dependent on tube feeding."

53. ALSO on 4/14/2015, there was a Moderate Sedation Pre Procedure Form completed by a Dr. Gregory H. Broering, Resident MD.  In the Sedation Risk Assessment (pg 3387 of Ben Taub medical records), Dr. Broering states that Dr. Aphaues was an appropriate candidate for moderate sedation, and that he was "a patient with severe systemic disease that is not immediately life threatening."  Dr. Broering also stated that Dr. Aphaeus had regular heart rate, strong pulses, and that his lungs were clear bilaterally.  Dr. Broering also stated in the Focused Patient Interview and Physical Examination, that Dr. Aphaeus was fully awake as of that day.  He even wrote in his Assessment and Plan for a hemodialysis catheter placement on Decedent (pg 3380 of medical records), that his recommended sedation plan was "discussed with patient who communicated understanding."  According to Dr. Broering in pg. 3379 of the medical records, Decedent was in "no respiratory distress" as of his physical examination for the hemodialysis catheter placement on 4/14/2015.  Dr. Broering thereafter recommended a few sedation drugs, Versed and Fentanyl, to be used if required.  David M. Wynne MD agreed and signed off on Dr. Broering's 4/14/2015 Pre-op treatment plan for the hemodialysis catheter placement on pg. 3376. Therefore, as of 4/14/2015, Decedent was able to communicate and was in no respiratory distress.

54. On 5/11/2015 at 5:24pm, Dr. Sarah M. Palmquist, Resident MD, completed a similar physical, assessment and plan for pre-op, for a percutaneous gastrostomy tube placement (pg. 3376).  She also stated that Decedent was in "no respiratory distress" and "the plan was discussed with the patient who communicated understanding."  Dr. Palmquist also thereafter recommended a few sedation drugs, Versed and Fentanyl, to be used if required.  Dr. Cliff Whigham, DO signed off on Dr. Palmquist's 5/11/2015 treatment plan on 5/12/2015 at

9:01am, and wrote "See Pre-op notes completed by Dr. Palmquist on 5/11/2015" (pg. 3374 of records)

55. On 5/18/2015 at 4:35pm, Dr. Sarah M. Palmquist, Resident MD, completed another Pre Procedure Form.  In the physical examination and assessment and plan section, she wrote "no respiratory distress" and "the plan was discussed with the patient who communicated understanding."   Dr. James Gregg, reviewed her work at 9:26am the following day, 5/20/2015, and approved her diagnosis and planned procedure.

56. In the moderate sedation procedure form, (pg. 3386), Dr. Palmquist stated that Dr. Aphaeus had regular heart rate, strong pulses, and that his lungs were clear bilaterally.  However, she stated that Dr. Aphaeus was "a patient with sever systemic disease that is continuously life threatening."  She stated in the Focused Patient Interview and Physical Examination, that Dr. Alphaues' level of consciousness was zero (0) and he was unresponsive.   Yet she recommended the same sedation management plan as Dr. Broering.

57. A Dr. Justin A. Chetta, Resident MD completed the same Moderate Sedation Pre Procedure Form on 7/7/2015, and stated that Dr. Aphaeus was "a patient with mild systemic disease" and was a candidate for moderate sedation, and recommended the same "plan of sedation drugs to be used" on Dr. Aphaeus as Dr(s) Broering and Palmquist.  Dr. Chetta stated that Decedent had a regular heart rate, and strong peripheral pulses.

58. Interestingly, on the same 7/7/2015 at 11:48am (pg 3369) Dr. Chetta also stated that Dr. Aphaeus was in vegetative state needing replacement of feeding tube, recommended the same sedation plan as before, yet stated that "the plan was discussed with patient who

communicated understanding" Dr. David Wynne agreed with Dr. Chetta's treatment plan on 7/8/2015 at 11:18am (pg. 3366 of records).

59. Dr. Chetta actually disclosed that the patient, Decedent, was in a vegetative state in the prior sentence on that same page, 3369, and then stated that the treatment plan was discussed with patient who communicated understanding.

60. The interesting fact to be deduced from all this is that the hospital physicians consistently, *amongst others*, negligently, gross negligently, recklessly, intentionally, or knowingly, delegated treatment of an ill man to a bunch of resident physicians, without oversight. Hence, they authorized the continuous use of Decedent as a guinea pig even after he was mortally wounded under their care; because amongst others, as finally disclosed by Dr. Xandera, he was from Nigeria and likely had no funding.  Decedent was treated as a second-class citizen.  When they were done with their experiments on him, they wanted him out of the hospital.

61. Another evidence of civil rights violation, negligence, reckless, gross negligence, intentional or knowing acts of Ben Taub Hospital, its personnel, and its affiliates, as discussed in the previous paragraph, which all led to the various injuries- brain dead/vegetative state, organ failure, sacrum sores, et al sustained by Decedent.

62. Furthermore on 3/16/2015 at 1:22pm, in the Teaching Physician note, Dr. Martha P Mims wrote "the family - I know the son from the last hospitalization. I don't think there is much we are going to be able to do for his AML."  Hence, Defendants succeeded in creating a situation in which Decedent would not be able to handle chemotherapy for his AML.

63. Throughout the second hospital visit, Decedent never received treatment for the relapsed acute myeloid leukemia (AML) for which he was admitted.  Defendants *amongst others*, negligently, recklessly, gross negligently, knowingly, or intentionally, put him in a neurological state by which he could not qualify for or handle chemotherapy.  Defendant's plan to execute Decedent was fully put into action.

<u>Withholding of Life Sustaining Treatment</u>

64. After Decedent was in a mortally wounded state, it became a goal by the physicians to get him out of the hospital at his and his family's expense.

65. As of 3/25/2015, Dr. Joslyn Fisher was already executing the plan of withholding life sustaining treatment from Decedent.  At 4:06pm, in her Ben Taub Ethics Consult notes, she wrote "…Medically appropriate treatment option(s) for end of life care - consider offering several options -including withdrawal of all life-sustaining care, withdrawal of some life-sustaining/prolonging care, or limiting escalation of care."  She also wrote that Dr. Sarkar must document this (Exhibit F).  She even went as far as writing into Decedent's medical records, "Excerpt from Harris Health System Advance Directives Policy 4128," which includes Harris Health's procedures for decision regarding life-sustaining treatment, and which somewhat mirrors Texas Health & Safety Code 166.046.

66. Per Dr. Sarkar's progress notes on 3/27/2015, "We have suggested that at this time our medical recommendation will be to withdraw life sustaining measures e.g. Hemodialysis and mechanical ventilation."

67. Per Dr. Lydia Sharp's 7/9/2015 consult notes, evidently on 3/26/2015, Neurology physicians were consulted on Decedent's case and "he was found to have persistent brainstem reflexes

but extensor responses to noxious stimuli...severely disabled state with only fragments of understanding, requiring long lasting or indefinite nursing care.  Hence as of 3/26/2015, Decedent still had brainstem reflexes, but will require long lasting or indefinite nursing care. This is another evidence of the cost Defendants would have to bear if he was to be alive.  But rather, they decided to plot to kill him.  For example, he had brain reflexes on 3/26/2015, but on 3/27/2015, Dr. Sarkar was suggesting withholding life-sustaining measures.

68. Per Dr. Sharp's 7/9/2015 notes, "Neurology has also seen the patient on 6/15 and 6/23, no change in exam was seen."  So as of 6/23/2015, Decedent still had brainstem reflexes *et al*, but will require long lasting or indefinite nursing care.  However, Decedent did have responses to stimuli as of 6/30/2015 per Dr. Jared Lee and Wayne Xandera.

69. Dr. Sharp's notes describing Decedent on 7/9/2015 at 1:37pm went as follows:  "Currently the patient is afebrile with stable vital signs within normal limits. Labs show normal white count and no major metabolic abnormalities... Intact cough."  So on 7/9/2015, Decedent had no fever, his labs showed normal white blood cell count (white blood cells fight infections), and no major metabolic abnormalities and had an intact cough.  However, she stated that Decedent had not been given a neurological exam for the past three (3) months.  In other words, Defendants negligently, gross negligently, or intentionally left him there to rot and deteriorate hoping that he would die, while writing their recommendation of DNR.

70. On May 28, 2015, Ben Taub Hospital personnel and defendants recommended for Decedent to be discharged to another facility, gave them a list of locations, and told them that the facilities on the list will cost them $1000 per day, and that the family would incur such cost. The family disagreed to such a discharge because neither Decedent nor any Family-Plaintiffs

can afford such an expense.  Moreover given that Ben Taub Hospital, its personnel, and its affiliates (i.e. Baylor College of Medicine physicians) caused the harm to Decedent and his family, it was inconceivable that Decedent's family was being asked to accept financial responsibility for the injury caused to Decedent while on admission at Ben Taub Hospital.

71. Decedent went to the hospital with neurological functioning to get treated for his pre-existing health problems.  However, Ben Taub Hospital personnel and their affiliates caused him multiple organ failure, irreversible injuries, continues bodily injury, as well as continuous grief to Family-Plaintiffs.  The hospital's planning or attempts to discharge him with the extensive brain and various other injuries he sustained at the hands of Ben Taub Hospital, its personnel, and its affiliates, in addition to the untreated disease he was admitted for, merely shocked the family's and really any reasonable mind's conscience; not to mention that they are suggesting that his family bear their estimated $1000 per day cost to care for him in his incapacitated state, with multiple bedsores, with proof of aggravated assault on him during the 3/6/2015 procedure, and his swollen arm and body.

72. Even after months of search, the family was even unable to find an alternative venue on the list provided by the hospital staff that would accept Decedent under such circumstances (e.g. $1000/day).

73. Starting on March 12, 2015 with Dr. Sarkar, the hospital physicians began to pressure Decedent's family to make him a DNR patient.  On 3/24, 3/25, 3/29, 4/1, 4/27, 5/28, 6/23, & 7/11, the hospital physicians attempted via discussions, to convince the family to approve withholding of life-sustaining treatment or to discharge him.  To which they continuously

refused and kept searching for alternative transfer venues.  Decedent was still in a minimal

conscious state, not in a persistent vegetative state.

74. Defendant, Joslyn Fisher, entered the recommendation to withhold life-sustaining treatment

in the records of Decedent as of 3/25/2015 in her "Initial Summary of

Recommendations."  The decision was not made by the Harris Health Committee to withhold

life-sustaining treatment from Decedent until about July 27, 2015, and the 10-day time period

ran out on August 10, 2015 per Dr. Halphen's entry to in Decedent's medical records in

August.

75. However, per the records, Dr. Joslyn fisher entered the life sustaining treatment

recommendation in Decedent's medical records as of 3/25/2015.  The plan was already in

place to create a scenario by which they can withhold life-sustaining treatment from

Decedent and finish him with the knockout blow.

76. On 4/1/2015, Defendant, Dr. Christina Kao, the MICU attending physician, Dr. Joslyn Fisher,

and others met with the Decedent's family.  Per Dr. Kao's entry in the medical records, she

suggest that the hospital and family agree to make Decedent a DNR patient, and

recommended withholding of life-sustaining treatment such as dialysis, vasopressors, and

transfusions.  Pertinent parts of her writing in the medical records of Decedent on 4/1/2015

at 7:47am reads as follows:

> "A status of DNR in case of cardiac arrest was suggested as well as the recommendation
> by myself to withhold dialysis, vasopressors, and transfusions. The family wishes patient
> to remain at current status."

77. The family refused to allow the withholding of life-sustaining treatments and informed the

physicians that Decedent would have wanted any fighting chance to stay alive.  In Dr. Joslyn

Fisher's consult notes on 5/18/2015 at 2:10pm, on at the 4/1/2015 meeting with the family, "Family-Plaintiffs describe Mr. Ohakweh as a "fighter" who would want "everything done" to save his life." She also wrote "Since the family discussion on 4/1/15, the patient no longer requires dialysis." This is interesting because Decedent still had kidney issues, and ultimately died from it per his death certificate. Yet, the family was told he no longer required dialysis. Defendants merely just intentionally withheld hemodialysis from Decedent, knowing he was going to die without it.

78. The physicians, unsuccessful in obtaining approval to withhold life-sustaining treatment from Decedent or his family decided to further create a dire situation for a man fighting for his life by further writing all over his medical records about the DNR recommendation, in anticipation of the Harris Health Ethics Board's 166.046 review of the records and decision making of whether to withhold life sustaining treatment, if the family did not agree to the withholding of life-sustaining treatment.

79. On 6/23 & 6/30, Jared Jung-Taek Lee wrote the same 4/1 DNR statement as Dr. Christina Kao in Decedent's medical records which reads as the following:

> "4/1 family meeting with Ethics with Dr. Kao (MICU attending), Dr. Jabuonski (MICU fellow), Dr. Winograd, Dr. Fisher (ethics), Dr. Citron (palliative care) and multiple representatives from case management and chaplain; recommended status of DNR, family wished for patient to continue max medical support"

80. On 6/24 & 6/27 of 2015 Holly J. Bentz copied and pasted the same 4/1 DNR statement from Jared Jung-Taek Lee's medical entry in Decedent's medical records. Dr. Doris Lin signed off on Holly Bentz's writings on 6/24/2015.

81. Dr. Wayne Xandera, attending physician and Associate Professor at Baylor College of Medicine, signed off on the 6/23 & 6/30 statements by Jared Lee, and also wrote in Decedent's medical records on 6/29 at 10:16am:

> "65-yo with AML, dx 2013, CHF, DM, herpes, admitted for respiratory failure, PEA, anoxic brain injury, ventilator assd pneumonia, minimally conscious but leaning toward a PVS, *no funding with his being Nigerian*, family is trying to decide on goals of care, a meeting tomorrow with them will take place with Ethics committee."

82. Dr. Sudha Yarlagadda copied and pasted the same 4/1 DNR statement from Jared Jung-Taek Lee's medical entry in Decedent's medical records on 7/1, 7/9, 7/10, 7/11, 7/18, 7/16.  Dr. Anita V. Kusnoor Signed off on Sudha Yarlagadda's writings on 7/17/2015 as attending physician.

83. Dr. Veronica Vittone copied and pasted the same 4/1 DNR statement from Jared Jung-Taek Lee's medical entry in Decedent's medical records on 7/8/ & 7/12.

84. On 7/21, 7/22, 7/23, Xiaoming Jia's medical notes in Decedent's medical records included another copy and paste of the same 4/1 DNR statement from Jared Jung-Taek Lee's medical entry.

85. By the Harris County Ethics Board meeting under Texas Health & Safety Code Rule 166.046, which occurred on 7/24/2015, it was basically obvious that the Ethics Board, including Dr. John Michael Halphen, was ready to make Decedent a DNR patient.

86. Plaintiffs were also not given proper 48hrs advanced notice prior to the meeting, nor were they given Decedent's medical records 10 days before as required by Harris Health Hospital Policy and Texas Health and Safety Code 166.046(b)(4)(c).  Bethrand was blind-sighted with a letter in the mail less than 48hrs before the meeting; and out of concern that the physicians

were going to succeed in killing his father/Decedent against his fathers' and the family's wishes waived the short notice matter and immediately retained counsel for the meeting.

87. At the meeting, Dr. John Michael Halphen stated that the ultimate decision was on the ethics board team, with his decision as supreme; that the family were merely there to give their input, and that if the family did not agree with the decision, they had 10 days to appeal the decision to the probate court.

88. In regards to procedure, the Ethics Board personnel stated that they were not involved in the treatment of Decedent; that their job was merely to review the records, listen to input, and make their decision on whether to withhold life-sustaining treatment which in this case consists of withholding CPR, dialysis, pressors, and ICU treatment.  This was a lie.

89. Joslyn Fisher, and Joseph Kass were involved in the treatment of Decedent while executing their 166.046 consult.

90. For example, Dr. Kass was involved in the treatment of Decedent on 3/26/2015.  He signed a consult on **3/26/2015 at 6:11pm** and wrote "I personally examined Aphaeus Ohakweh with the resident on **3/27/15.** I have discussed his case with the resident and agree… as per resident note… patient has essential no chance of meaningful neurological recovery… patient will enter a vegetative or minimally conscious state."  This is during the period in which the physicians were merely plotting and per Dr. Sarkar, they already agreed to DNR him.  Now Baylor and Ben Taub's Chief of Neurology has joined in the list of parties working to execute Decedent.

91. Ms. Fisher was an attending physician overseeing Decedent on or about 4/30/2015 and 5/1/2015, ordering treatment medications.

92. Dr. Anita Kusnoor was the attending physician overseeing decedent during the period of the ethics board meeting, and was present at the ethics board meeting.  One of the topics discussed at the Ethics board meeting, aside from withholding life-sustaining treatment, was that the physicians were "weaning [Decedent] off the breathing ventilator" – a process by which a patient's dependence on mechanical ventilation is reduced and eventually terminated, **implying that Decedent was breathing on his own without mechanical assistance** -- and that Decedent could be transferred to a hospice care facility.  Dr. Kusnoor claimed that she stopped attempting to wean Decedent off the ventilator because she did not want to "rock the boat" and suggested that the family take him to a hospice care.

93. At the ethics board meeting, it was communicated to Plaintiffs that Decedent was "brain-dead."  This was not the case as per the medical records, Decedent was in a "persistent vegetative state."  There's a HUGE difference between the two.  Brain-dead means no brain activity and complete dependence on mechanical life-support (e.g. ventilation-oxygen machines to breathe, etc).  Such is not a requirement for persistent vegetative state patients.  It depends on the level of their brain injury.

94. Family-Plaintiffs asked whether the periods in which Decedent was able to breathe on his own without a ventilator was increasing or decreasing- to better assess for signs of cognitive and respiratory improvement, and to make a better informed decision on withholding life-sustaining treatment.  None the physicians and executives, 90% of them physicians tied to Harris Health, in the meeting room could answer this question.  Hence, the family asked the physicians to go back and try to record-time the intervals in which Decedent was breathing

on his own before the ventilator takes effect to assist again, to see if the time margins are increasing or decreasing before such a decision would be made.

95. The Ethics Board meeting was merely an attempt to fraudulently bully the family into succumbing to the demands of Harris County Ethics Board, Ben Taub and Baylor health care providers (i.e. Defendants) to kill Decedent by withhold life-sustaining treatment from him. Decedent had been in ICU for months.

96. The issue at the Ethics Board meeting was whether the family would authorize the physicians to withhold CPR, dialysis, pressors, and ICU treatment, or he be discharged at the expense of his family.

97. Authorization to withhold ICU treatment from him, coupled with withholding pressors, CPR, and dialysis, meant a bad faith authorization not to touch him anymore; even though Defendant were the ones to put him in his condition.

98. Dr. Joslyn Fisher was at this meeting as a proponent to the withholding life-sustaining treatment. Dr. Josheph Kass was at also at the meeting and a proponent of the withholding life-sustaining treatment. These two physicians directly participated in the treatment of Decedent while during the withholding of life-sustaining treatment procedures.

99. Rather, Family-Plaintiffs were being deceived into making a blind decision to DNR Decedent based on the inconsistent and false reasons from the physicians. These physicians could not even tell the family the truth as to what happened to decedent and his state. According to Halphen and the ethics physicians, "…With treatment, he's going to die anyway. Without treatment, he was going to die anyway."

100. Family-Plaintiffs present at the meeting requested for the specific life-sustaining treatment recommendations in writing, to which the Ethics Board refused. Family-Plaintiffs refused to give such authorization and stated that they needed some time to speak with other family members in United States and abroad. Dr. Halphen granted the family a week to decide, but still make it clear that the decision was up to the Ethics board, and ultimately his decision.

101. There exists a recorded telephone call voice mail from Dr. Halphen, left on Bethrand's voice mail within minutes after the 166.046 meeting seeking the family's response from Bethrand, mentioning the DNR suggestions again, and asking Bethrand to contact the hospital staff with their response.

102. Throughout the week of 7/26/2015, Dr. Halphen personally contacted Bethrand on Bethrand's his cell phone eight (8) times in an attempt to elicit a response from Bethrand to act on behalf of the family and authorize the Harris Health Ethics Board to withholding of life-sustaining treatment.

103. After seeing 8 missed calls and receiving the voicemail from Dr. Halphen, Bethrand called Dr. Halphen back, told Dr. Halphen that the family needed time to decide, and ultimately asked Dr. Halphen to put his recommendations in writing; to which Dr. Halphen refused and stated "this conversation is over," then hung up the phone on Bethrand.

104. Immediately after the telephone call, Bethrand and Family-plaintiffs immediately drafted and sent a response letter (Exhibit I), as requested by Halphen in the prior mentioned voice mail message, to Harris Health & Ben Taub stating their position in writing not to withhold life-sustaining treatment, and that Decedent would have wanted every chance to be alive.

105.    By this time, Family-Plaintiffs received over 26,000 pages of medical records from Harris

Health, signed under penalty of perjury by Harris Health's custodian of records.  Said records

were incomplete or manipulated in both form and substance.

106.    On 8/10/2015, Decedent's family received a decision letter from Dr. Halphen on behalf of

the Harris Health Ethics Board, stating that they have decided to withhold life-sustaining (i.e.

CPR, dialysis, pressors, and ICU treatment).  The family immediately responded with the

attached, another letter ("Exhibit J") stating that they disagree with the Ethics Board's

decision, and that they the family desires that Decedent received continued administration

of CPR, dialysis, pressors, ICU treatment, and other necessary measures to sustain his life.

107.    On a subsequent visit to the hospital after the Ethics Board Meeting, Bethrand spoke to

the nurse on staff who claimed that the physicians attempted to wean Decedent off the

ventilator, and that decent was breathing on his own for about a 3 day period.  Thereafter,

the nurse returned after a shit and to his disappointment saw Decedent was put back on the

ventilator, at the request of hospital executives.

108.    Such is interesting because if Decedent was really in a persistent vegetative state, did he

require tubes and breathing ventilation if he was breathing on his own for such extensive

periods of time?  The further troubling fact is that too much use of such breathing ventilation

machines on patients, coupled with effects of the hospital's cool temperature setting – set at

low temperature to fight off airborne viruses, can lead to pneumonia of Decedent and

similarly situated patients.

109.    Defendants are intelligent.  They wanted to make it seem as if Decedent was brain-dead

and unable to breathe on his own.  Meanwhile, they would keep him attached to the

ventilator - risking him pneumonia and subjecting him to death from pneumonia, while withholding, conspiring, depriving, and/or subjecting Plaintiffs to the deprivation of the necessary medical treatment and clearly secured legal rights to which they are entitled.

110. IMPORTANT FACT:  Harris Health System's policies and procedures regarding futility care and withholding life-sustaining treatment is unconstitutional.  It gives unilateral authority to the hospital staff and physicians to withhold life-sustaining treatment from patients, even against the wishes of the patient or his family.   Once patients are put through Harris Health's futility care determination procedure, they are basically on the equivalent of "death row." How?

111. Health & Safety Code 166.046(d), (e), and (f) all contain conditions to be met in executing the life-sustaining treatment withholding procedure, including a deadline in which the physicians may enter that life-sustaining treatment is "medically unnecessary" in the patient's medical records.  On information and belief, Harris Health System's policy and procedures does not allow for such condition.  Harris Health System's policy and procedures requires the physician to write that life-sustaining treatment is "medically inappropriate" without waiting for the deadline.

112. "Inappropriate" delivers or insures a deathblow and the ultimate deprivation of substantive due process rights of patients including Decedent, and also insures the deprivation of the privileges granted to family members as treatment decision makers under Texas Health and Safety Code Section 166.039(b).  "Unnecessary" allows for a possible intervention by future physicians acting in good faith when there is a chance.

113.     Therefore, even when a subsequent attending physician examines the patient, feels that

life-sustaining treatment is medically necessary (i.e. if prior physicians were wrong or acting

in bad faith and a subsequent physician fees that the patient SHOULD receive life-sustaining

treatment), the patient is precluded from receiving such treatment under Harris Health

System's futility care treatment.

114.     Evidence will show that Harris Health System's policy and procedures and/or customs and

practices, create an avenue or situation by which Defendants to violate Plaintiffs rights that

include, amongst others, their rights under Health & Safety Code Chapter 166, Texas Human

Resources Code Chapter 102, Texas Constitution rights under Article 1 Sections 3, 3a, 13, 17

and 19, and their clearly protected Federal and U.S. Constitutional rights and privileges.

115.     Interestingly, the physicians attempted to take advantage of the situation to conspire to

directly or indirectly deprive Plaintiffs of their U.S. constitutionally protected privileges, and

conspire to fill, and did kill Decedent.

116.     While the physician Defendants were writing the DNR/life-sustaining treatment

withholding recommendations months before the deadline allowed, they were depriving or

subjecting Plaintiffs to the deprivation, or conspiring to deprive or subject Plaintiffs to the

deprivation of their clear and protected federal and constitutional rights and privileges, while

also violating Texas Health & Safety Code Sections 166.046, 166.039(b), and 166.050; and

Texas Human Resources Code Chapter 102.003.

117.     Unfortunately for the physicians, their violation of *amongst others*, Texas Health & Safety

Code Sections 166.046 and 166.039(b), Texas Human Resources Code Chapter 102.003,

clearly established laws including Chapter 166, Article 1 Sections 3a, 17 and 19 of the Texas

Constitution, 14th Amendment to the U.S. Constitution, EMTALA, *et al*, exposes them to liability and criminal prosecution as allowed by Texas Health & Safety Code Sections 166.045 and 166.048, 42 U.S.C. Section 1983, 42 U.S.C. Section 1985(3), 42 U.S.C. Section 1395dd, *et al.*

118.    Even Texas Health & Safety Code 166.039(c) states that treatment decision in cases where a person has not executed or issued a directive and is incompetent or incapable of communions must be based on knowledge of what the patient would desire, and the patient's family (i.e. spouse, reasonably available adult children, parents, or nearest living relative) if available must be a participant in making a treatment decision including withholding or withdrawing life-sustaining treatment.

119.    Decedent's family gave Defendants as of 4/1/2015, knowledge of what Decedent would desire.  Per Dr. Fisher's 5/18/2015 consult notes, she even wrote that "He was a fighter that would have wanted everything done to save his life."

120.    Per the medical records, Defendants also wrote the names and telephone numbers of Decedent's family members and representatives including his son Bethrand, his spouse(s) Philomina and Ifeoma, his son Obinna (in Nigeria), his daughter-in-law Chinyere, his daughter Chizoba, and his attorney as subscribed in the pleading below.

121.    Defendants were also aware of the existence of Decedent's daughter Emily-Jean who was present at the Ethics Board meeting; and who also visited Decedent in the hospital.  Upon her visit to see her father in the hospital, Dr. Gupta denied her pertinent details and explanation about Decedent's care.  She asked Dr. Gupta why her father was not being provided with dialysis, and was told to it was being withheld, and to communicate directly with Bethrand as

he was the family representative going forward.  This was after the hospital was informed of the existence and provided contact information of the family attorney.

122.    Further evidence is that Decedent also did not sign any advanced directive or consent upon admission or at any time during his stay in the hospital.  But Defendants were keen on accelerating decedent-plaintiff's death; *amongst others*, he was black/African American, and was from Nigeria.

123.    Also, per Dr. Weei-Chin Lin's bogus entry into the records on Dr. Wang's account, Decedent "expressed his interest in seeking further chemotherapy for AML relapse."  There is no evidence that Decedent or his family consented to the attempted bronchoscopy.  The only evidence provided by Defendants has multiple forged signatures on the consent form.

124.    Decedent clearly already had a bronchoscopy in the first treatment.  It was negative and unnecessary.  He beard through it, and finally received the chemotherapy he needed.  This time around, he was clear as to what he needed – chemotherapy.

125.    Defendants did not comply with *amongst others*, Texas Human Resources Code 102.004 *et al*; nor did Decedent ever consent to any bronchoscopy.  Even more evident, there is no pertinent details as to the failed bronchoscopy.  All the consents claimed to be obtained were for an emergency tracheostomy, which occurred after the bronchoscopy.  Consent is never necessary for an emergency procedure.  Defendants know that.  They were merely covering up their continuous *amongst others* grossly negligent, reckless, malicious, knowing, and intentional wrongful actions with more wrongful or criminal actions (e.g. *lies*).

The Final Blow

126.    With the authorization to withhold life-sustaining treatment from Decedent from Harris Health Ethics Board and Dr. Halphen, and without being able to find any alternative venue to accept Decedent under such circumstances, the month of August 2015 was a critical month for the physician to deliver the final blow to Dr. Aphaeus.  Dr. William Graham and Dr. Anisha Gupta were the physicians on staff during that month.

127.    Decedent was not taken well care of by Dr. William Graham's medical team, which included Dr. Anisha Gupta.  In fact, as seen in the medical records there is blatant negligence, gross negligence, criminal negligence, knowing or intentional treatment of Decedent, i.e. deadly standard of care negligently, gross negligently, knowingly, or intentionally, administered to Decedent during his time at Ben Taub and especially in August 2015, the final weeks of Decedent's life.

128.    The medical records clearly show how Decedent's once stable state began deteriorating in front of the medical teams eyes and the treatment the medical team negligently, gross negligently, knowingly, or intentionally provided to Decedent accelerated his ultimate death on September 7, 2015.

129.    It is documented in the records that daily labs were performed up until August 14, 2015. These daily labs included a complete blood count (CBC) and a basic metabolic profile (BMP). On August 14, Decedent had the following labs hemoglobin (hgb) 8.4, hematocrit (hct) 27.4, and platelets (plt) 11. One should know that these numbers are way below the normal cutoff especially the platelets. To this end, the medical team did transfuse Decedent 1 unit of platelets on that day.

130.    Shockingly though, the next set of labs for Decedent was not performed until August 20. Now most medical professional would agree that after transfusing one blood product, it is normal practice to perform a post-transfusion lab work; and this should hold more true to anyone in such a critical state as Decedent. However the medical team delayed this blood work until August 20th, 2015 at which point things could only be worse.  August 20th was also a key day regarding the medical management of Decedent because it was the day that marked the DE-ESCALATION of Decedent's medical care.

131.    In other words, on this paramount day of August 20th 2015, Decedent had the following blood work: Hgb 6.6, Hct 22.1, and Plt of 7.  Again, these numbers are way below the normal ranges. In fact it is documented throughout the doctors daily progress notes that Decedent would receive blood product transfusions as needed if his Hgb <7 and/or his plt< 10 or shows signs of bleeding.  Thus with this in mind the medial team elected to give him ONLY 1 unit of packed red blood cells which would only effect his Hgb and not his Plt.

132.    On August 24th, 2015 at 1.34pm, Dr. Anisha Gupta spoke over the phone with Decedent's son, Ibeh about his father's August 20th lab work at which time she stated that she will not transfuse any platelets until Decedent bleeds.

133.    Dr. Gupta documented in the medial records that "getting Plt tx for Plt of 7 on 8/20 without bleeding episodes was not worth the risk." However, all along Decedent had been receiving Plt transfusions with values even greater than 7.

134.    For example, on 8/14 he received 1 unit of plt for a value of 11, on 8/9 he received 1 unit for a value of 16, and on 8/5 he received 1 unit of plt for a value of 23. It should be known

that up until 8/14, Decedent was receiving daily blood transfusion or platelet transfusion as part of his continued care.

135.    After receiving the blood transfusion on 8/20/2015, the medical team made the decision not to obtain post-transfusion blood work, let alone conduct any further blood work until 8/27/2015.

136.    On or about the evening of 8/25/2015, Bethrand received a call from Dr. Anish Gupta indicating that Dr. Ohawkeh was in imminent death, and that Bethrand should come to the hospital if he wanted to see his father one last time.  Bethrand and family immediately left for the hospital.  When they arrived at the hospital, the nurses on staff informed them that Decedent was not dying, and that Dr. Gupta was away in the ER.  Bethrand and family waited for Dr. Gupta.  She did not arrive.

137.    On 8/27/2015, Decedent's blood work was as follows: Hgb 4.4, Hct 15.2 and Plt of 2. On this day, one would also see derailments in some of Decedent's other blood works including a creatinine (Cr) of 2.7 and blood urea nitrogen (BUN) of 78.  Up until 8/27/15, as seen in the medical records, Decedent's BUN and Cr were stable.  Therefore, it comes as no surprise why Decedent suffered acute kidney injury; anyone who went to medical school knows that the number one cause of acute kidney injury is anemia or blood loss, which is evident in the drop in Decedent's Hgb from 6.6 to 4.4 over the course of one week: from 8/20/2015 to 8/27/2015. All of which could have been prevented if the medical team did not amongst others, act willfully wrongful, with conscious indifference or reckless disregard to the rights, life, and safety of Plaintiffs, recklessly, gross negligently, intentionally, and/or knowingly to administer improper and/or deadly health care to the patient as he severely deteriorated.

138.    And so the downward spiral continues…

139.    On 8/27/2015 the medical team pumped Decedent with 3 units of packed red blood cells and 1 unit of platelets. The next set of blood work was performed on August 31st and this lab work was even WORSE. Decedent had a Hgb of 4.0, Hct of 13.3, and Plt of 1. The medical team again attempted to cover-up their wrong doing by ordering to give Decedent 3 units of blood and 2 units of platelets on 8/31. On a 9/1 visit to the hospital, Edwin RN told Bethrand that Decedent made 75 milliliters of just blood on 08/31/2015 and 25 milliliters that morning of 9/1/2015.

140.    By 9/2/2015, Decedent's lab work showed a Hgb of 5.8, Hct of 17.1, Plt of 28, and his poor kidney function was reflected in a Cr of 5.1, BUN of 170 and urine output of virtually zero.

<u>The Death</u>

141.    On the last week of August 2015 provided many Defendants with the Texas Civil Practice and Remedies Code Chapter 101 & Chapter 74 notice of claim letters.  Some of the letters sent to the physicians were sent to Defendant-Barbara Johnson at Baylor College of Medicine's risk management department.  The notices of claim letters were pretty detailed.

142.    On September 1 and September 2, 2015, Mrs. Barbara Johnson also received the emails attached as "Exhibit K" and hereby incorporated by reference.  Barbara Johnson schedule a call to discuss Decedent's matter.  During the call on September 2 at 2pm CST, Barbara Johnson and another gentleman- Mr. James Banfield - were informed that Dr. Anisha Gupta was part of the medical team with Dr. Graham and were executing actions on Decedent that was accelerating his death.  She was also informed that a new medical team was on staff treating Decedent as of September 1.

143.     As a risk manager(s), Barbara Johnson and Mr. Banfield had a duty to investigate and insure that Anisha Gupta and Dr. Graham were no longer part of the medical team treating Decedent.  However, instead, Anisha Gupta was kept involved in the care of Decedent.

144.     Per the medical records, on or about 09/02/2015 at 9:29am, Dr. Gupta ordered a high dosage of acetaminophen (TYLENOL) for Decedent to be administered every 4 hours; a dosage level greater than the maximum limit allowed.

145.     On 09/02/15 at 12:50pm, Decedent was given 500 mg of acetaminophen (TYLENOL) tablet.  Per the Registered Nurse, Candelaria J. Rodriguez's comments: "Dr. Gupta notified of dosage over 4g limit. MD states okay to given medication."

146.     On 09/02/15 at 5:00pm, Decedent was given 500 mg of acetaminophen (TYLENOL) tablet.  Per the Registered Nurse, Candelaria J. Rodriguez's comments: "part of barcode torn off. Medication given now. Okay to give med per MD Gupta request. Patient with T> 100."

147.     On 09/03/15 at 9:05am, Decedent was given 500 mg of acetaminophen (TYLENOL) tablet.  Per the Registered Nurse, Candelaria J. Rodriguez's comments: "Per Dr. Gupta- okay to administer acetaminophen as she is okay with going over the 3 g /24 hr max limit."

148.     Also on 09/03/15 at 1:10pm, Dr. Ohawkeh was given another 500 mg of acetaminophen (TYLENOL) tablet.  Per the Registered Nurse, Candelaria J. Rodriguez's comments: "Per Dr. Gupta- okay to administer acetaminophen as she is okay with going over the 3 g /24 hr max limit."

149.     On the morning of September 7, 2015, Defendant Anisha Gupta contacted Bethrand over the telephone around 9:00am to inform him that Decedent had died.  Dr. Gupta stated that Decedent developed heart complications around 6:30am, and was pronounced dead around 8:30am.  The death certificate stated 8:57am.

150.  In Decedent's death certificate, signed by a Dr. David Hyman, the cause of death listed was AML, Renal (i.e. Kidney) Failure, Respiratory Failure, and Hypoxic Ischemic Encephalopathy.

151.  Since the causes of death listed partly hailed from the March 6, 2015 incident and subsequent activities, with the March 6 2015 incident being the result of a forged document, there should have been a thorough investigation to disclose the criminal forgery that triggered the events leading to the death. Hence, the death certificate should also note that a homicide had occurred, or at least an investigation is pending, in the "manner of death" section. It does not (Exhibit Z). Consequently, without a homicide listed on the death certificate "manner of death" section, the Houston Police Department has no authority or jurisdiction to investigate the incidents leading to Decedent's death. This is another evidence of a cover-up attempt or obstruction of justice.

152.  It is worth noting that per National Institute of Health, the average time to death for someone of Decedent's age with AML and without treatment is 3 to 4 months. Decedent lasted 6 months even with his mortal wound, and lack of treatment. On the 6th month and 1 day, Defendants killed him. Furthermore, the kidney failure was induced and caused by Defendants. They also caused the respiratory failure and the hypoxic ischemic encephalopathy (i.e. brain failure).

153.  Defendants negligently, gross negligently, intentionally, knowingly, maliciously, or with criminal negligence, killed Decedent by, amongst others, inducing a need for the dialysis, a dialysis they decided to withhold from Decedent against the family's wishes, and armed with the death dagger wrongfully granted to them by Dr. Halphen, Joslyn Fisher, and Harris Health

Ethics Board against the family's wishes (i.e. to withhold CPR, dialysis, pressors, and ICU treatment).  Withholding life-sustaining treatment is the decision of the family per Texas Health and Safety Code (THSC) Section 166.039(b) and American Medical Association Code of Medical Ethics Rule 2.20 "Withholding or Withdrawing Life-Sustaining Medical Treatment. Yet the Harris Health Ethics Board member Defendants did not care.  They were focused on granting an authorization to kill Decedent.

154.    The interesting fact is that Dr. Halphen, Joslyn Fisher, and Harris Health Ethics Board decided to withhold CPR, dialysis, pressors, and ICU treatment.  Texas Health & Safety Code 166.046(d) and Harris Health System Advance Directives Policy 4128(8) required defendants to transfer Decedent to a physician, an alternative care setting within the facility, or another facility that will comply with the family's wishes as part of the process.  However, defendants did not do so.  Decedent was kept in the same Ben Taub Hospital unit 6D room 10 where he was as of the July 24, 2015 meeting, and Defendants (e.g. Anisha Gupta, William Graham, etc), accelerated his death while he was under their control.

155.    Defendants, rather than acting their role in good faith as health care providers with fiduciary duties to Dr. Ohawkeh and his family, deprived Decedent and his family of their civil rights, cause mortal injury to Decedent, as well as his death and grievous injury to his family and community.

<u>Additional Missing and Bad Faith Activity in the Medical Records</u>

156.    Decedent's family requested for a copy of his complete medical records from Ben Taub Hospital on or about July 24, 2015, along with a business records affidavit attesting to the authenticity of the records under oath under penalty of perjury.  Ben Taub Hospital provided

Decedent's family with over 26,000 pages of his medical records along with an executed business records affidavit authenticating such records.  The medical records contain false information and were also incomplete.

157.   Dr. Van Hoang's statement about the 3/6/2015 incident is nowhere to be seen.  She signed the forged consent form with a time of 10:10am in the morning of 3/6/2015 that alleges that Decedent consented to a bronchoscopy.  Yet there is no details of the bronchoscopy that was done on 3/6/2015 except for physician and staff's accounts of the 3/6/2015 traumatic incident (e.g. Mimi Phan, Nurse Elan Hailey)

158.   Furthermore, the medical records provided per the July 24, 2015 request were only from 3/4/2015 and thereafter.  There were no records from the first 2013 treatment.  These records were later provided to Decedent's family, and also contain deceptive or forged documents.

159.   For example:  According to the medical records, David Matthew Wynee executed a biopsy and collected soft tissue from Decedent's left pelvic mass on or about 12/18/2013 at 00.00 hrs per a cytology report.  This begs the question, what were they doing collecting tissues from his left pelvic mass instead of treating him with chemotherapy?  And why was this was done at <u>midnight</u>?

160.   Defendant later provided medical photos of Decedent taken on 4/16/2015 that show severe bed sores all over his body as of 3/10/2015.

161.   It's worth noting that prior to the 3/6/2015 incident, whenever proper consent was obtained from Decedent for any procedures, Decedent's son was present to oversee and be explained the risks and benefits, and he would then communicate to his father to consent to

the procedure.  The physician on staff would then sign the consent form, and a nurse will

witness the document.  All occurred at the same time in front of Decedent and his son.

162.    After the 3/6/2015 incident, whenever proper consent was needed for Decedent's

treatment, and family member was around, the hospital physician would call Decedent's son,

explain the need for consent, he would give consent over the telephone, and a nurse will take

the telephone from the physician and confirm that she/he has witnessed the family's consent

to the specific procedure.

163.    For example, for the hemodialysis catheter procedure done on Decedent on 3/10/2015

by Van Hoang, under the oversight of Elizabeth Guy, according to Dr. Guy's notes, "verbal

consent obtained from family."

164.    The bronchoscopy and bronchial alveolar lavage executed on Decedent was a high-risk

procedure that should only occur with extreme preparation, proper and required equipment,

knowledge and highly trained and experienced physicians, and written consent.

165.    The tracheostomy, if an emergency procedure, required clear precautions and

administration that was knowingly and consciously disregarded by Defendants due to lack of

supervision, lack of experience, or their knowing, malicious, or intentional conspiracy to

directly or indirectly deprive or subject Plaintiffs to the deprivation of their clearly secured

U.S. Constitutional, Federal, or State rights including the substantive due process right to life

and right to fair jury trial under Article 1 Section 17 of Texas Constitution.

166.    Defendants did not obtain written consent.  They forged a consent form.  Plaintiffs did

not consent to, *amongst others*, the March 6, 2015 bronchoscopy procedure, the

tracheostomy, the bronchial alveolar lavage, or the withdrawal of life-sustaining treatment.

167.    Exhibit M, the consent form for the March 6, 2015 Bronchoscopy is a fraudulent document.  The expert affidavit states that the two signatures on said consent for are forged.

168.    Exhibit N, hereby incorporated by reference, is Decedent-plaintiff's son and estate administrator's affidavit attesting to the inauthenticity of the signature on the bronchoscopy consent form.

169.    Decedent was used as Defendant's guinea pig, for their research and experimental benefit.  Afterwards, they left him bleeding, continued to subject Plaintiffs to further harm with reckless, gross negligent, intentional, malicious, sometimes negligent, or knowing wrongful actions, and continued to violate Plaintiffs Federal and U.S. Constitutionally secured rights.

170.    Defendants did not want to treat decedent-plaintiff, but rather conspired to accelerate his death, or the ultimate discharge from the Ben Taub facility.

171.    Defendants, *amongst others*, put Decedent in a position by which he could not reasonably leave their control, and, *amongst others*, refused to make reasonable efforts to settle the claim and transfer him to a proper alternative care.

172.    Rather, they chose to keep Decedent in their control, and conspired to accelerate his death against Plaintiffs' wishes, and while violating Plaintiffs' clearly established rights under Texas State law, and their rights U.S. Constitutional and Federal statutory laws.

173.    Defendants were fully aware of the injuries their actions will subject, cause, or was causing decedent-plaintiff and his family (Plaintiffs) deprivation of their EMTALA, 14th Amendment rights, rights under Texas Health & Safety Code Chapter 166, as well as various harm or injuries.

174.    Based on the first hospital visit, Dr. Mims and Baylor physician staff were already aware of Decedent's AML and prior treatment.

175.    There was already evidence of delay in treating Decedent due to Gold Card or payment issues.   A bronchoscopy was done in the first hospital visit already.   The unnecessary bronchoscopy and bronchoalveolar lavage in the second hospital visit, rather than necessary chemotherapy, was an unnecessary and unreasonable wrongful activity.

176.    Nurse Hailey's comments are merely part of a cover-up because if she was there and was observing or participating in the procedure, she had a duty to make sure that written signed consent was obtained before the procedure began.  It wasn't.  Nurse Hailey's statement was also made or given over 6hrs after the incident occurred.

177.    On or about 3/10/2015, Dr. Sarkar disregarded his oversight of Dr. Van Hoang and a Dr. Mimi Phan, and allowed them to execute an invasive catheter procedure on Decedent's jugular without his presence as the attending physician.  This catheter placement, amongst other catheter placements, was wrongfully executed.   There are signs of intentional, malicious, gross negligent, reckless, or knowing failure to supervise the invasive activities of the residents and fellows.

178.    Again, per Dr. Sarkar's progress notes on **3/27/2015** - exactly three weeks after the bronchoscopy incident, "**We have suggested that at this time our medical recommendation will be to withdraw life sustaining measures e.g. Hemodialysis and mechanical ventilation**."

179.    Chemotherapy and hemodialysis are expensive medical treatments.

180.    Other Defendant physicians followed course afterwards and wrote the same recommendation in the records during their attendance of Decedent – in violation of 166.046(f).

181.    The physicians Defendants also intentionally, knowingly, maliciously, recklessly, or gross negligently disregarded their treatment of Decedent per the bed sores that developed.

182.    During the months between the March 6, 2015 incident and the life-sustaining treatment decision in late July 2015, Defendants violated various aspects of Decedent's right to proper treatment and improper discharge once admitted or while in their care.  They amongst others, withheld treatment from Decedent in order for him to deteriorate, subjecting him to withhold life-sustaining treatment against his and his family's wishes and the acceleration of his death.  Various defendants used Decedent during that time as their guinea pig or made misrepresentations in regards to decedent plaintiff's condition, in furtherance of the conspiracy to use Decedent as a guinea pig, prematurely discharge him, withhold life-sustaining treatment from him, and accelerate his death.

183.    Before the 166.046 ethics committee meeting, Dr. Xandera whose resident physician subordinate also violated THSC 166.046(f) in regards to Decedent, also wrote in the records that Decedent was from Nigeria and had no funding.  To the effect, Dr. Xandera created an economic rationale or incentive for the ethics committee to deprive Decedent of his EMTALA, 14th Amendment rights including his fundamental right to life, right to proper treatment, right to improper discharge (e.g. mercy killing), and right to remedy by due course of law under Texas Constitutional law – Article 1 Sec. 13.

184.    Even Ommenn, the social worker, and nurse Rebecca Williams were planning on discharging him in his condition.  Other defendants were falsely stating all over his records that Dr. Ohawkeh was in a persistent vegetative state when he was not. Dr. Xandera also disclosed that Mr. Banfield was aware of Dr. Ohawkeh's situation.

185.    Dr. Halphen, with medical record notice of improper THSC 166.046 procedures (i.e. THSC 166.046(f)) and on professional notice of Code of Medical Ethics Rule 2.20, attempted to coerce Decedent's son to consent to the withholding of life-sustaining treatment from Decedent.  After unsuccessfully able to obtain such consent, he *still* ruled to withhold life-sustaining treatment against Decedent and his family's wishes.

186.    Once wrongfully obtaining the DNR authorization from Halphen & Fisher, under the oversight of Dr. Graham Defendant Dr. Gupta - amongst other wrongful acts or omissions - withheld platelet transfusions from Decedent and later caused Decedent to urinate blood.

187.    Plaintiffs notified Barbara Johnson at Baylor's risk management office, of Dr. Graham and his team's actions in accelerating Decedent's death.  Mr. Banfield was on the call with Barbara Johnson when Plaintiffs' – via the attorney subscribed below – disclosed or notified Baylor of Dr. Gupta and Graham's actions to Dr. Ohakweh (i.e. Decedent) that were subjecting Dr. Ohawkeh to the violation of his EMTALA and substantive due process rights as disclosed in sections above.

188.    Barbara Johnson & James Banfield, Barbara's senior manager, had a duty to exercise reasonable risk management policies and procedures as prudent risk managers in their position would do upon written or oral notice of the injury and foreseeable deprivation or subject to deprivation of life caused Decedent by Dr. Graham and his team, and amongst

others report such activity to the medical staff managers. They did not. Dr. Graham and his resident team should have been removed from administering any "care" to Decedent upon said notice; after all, medical staff rotated from the care of Decedent on approximately a monthly basis. Rather, Dr. Gupta was *still* allowed to continue to execute the mercy or intentionally killing of Decedent in the month of September, until Decedents' death.

189.    Defendants, *amongst others* maliciously, intentionally, knowingly, gross negligently, or recklessly performed or conspired to perform the bronchoscopy, bronchial alveolar lavage, and tracheostomy without consent, and also conspired various times to violate Plaintiffs' substantive due process right to consent to the bronchoscopy w/ bronchial aveolar lavage, and this right to consent or refuse life-sustaining treatment. Plaintiffs incurred the various damages as listed in the damages section of the pleading as a result.

<u>Conclusion</u>

190.    It is clear to see that there is a recurring practice of contacted or non-contracted physicians and Ben Taub Hospital staff working in cohorts to make false claims and receive Medicare and Medicaid insurance payments from the Federal and Texas State government.

191.    The BAL's done on Decedent/Realtor on December 2013 was unnecessary per the National Institute of Health Report, as decedent had AML, and the risks of injury from said report far outweighs the benefits.

192.    In the first hospital visit, the BAL was done on decedent. The physicians and staff delayed instituting and administering chemotherapy on Decedent due to his lack of Medicare/Medicaid/GoldCard insurance coverage. Decedent eventually received treatment, signed the documents that allowed for Medicaid coverage to compensate the hospital, and

paid his co-pay for the medically unnecessary bronchoscopy and/or the unnecessary blood transfusions he received until the was provided chemotherapy.

193.    In the second hospital visit, Decedent was a permanent resident.  Yet, he had no insurance.

194.    The hospital physicians and staff again delayed the chemotherapy treatment, and instead wrongfully embarked on another BAL.  It did not work favorably for them in the second hospital visit.    Therefore, they chose to have Decedent's son sign for the Medicare/Medicaid/GoldCard insurance coverage again.  The second time, he refused due to the language on the document and the circumstances of the situation.

195.    Consequently, Decedent was intentionally allowed to deteriorate and intentionally harmed.

196.    The pattern of practice evident is that Defendants entities repetitively allow, or work with the residents and fellows, to conduct multiple unnecessary medical treatments on patients – especially the ones without insurance – for the sake of experience, and with the understanding that Medicare/Medicaid/GoldCard insurance coverage will pick up the unpaid balance.

197.    Since this pattern of practice occurred in two separate hospital visits with Decedent, this pattern of practice is most likely a recurring practice within Ben Taub Hospital and/or Harris Health System.

198.    Baylor & UT physicians, other contracted staff, and Harris Health System staff all conspire to provide multiple unnecessary treatments to patients without insurance.  The most benefit

goes to the Baylor & UT physicians (e.g. professors, residents, and fellows) as they gain experience and get compensated under the co-op contract.

199.    Harris Health's risk is shielded and it reaps a potential windfall.  Harris Health gets to maintain the business and brand relationship of having Baylor & UT staff providing treatment in the hospital.  It also gets reimbursed for outstanding balances, or has authority to purse the patient for any deficiency.

200.    The fact that Decedent was killed after his son refused to sign the Medicaid document that he has a right to question its contents, and even after being deceived as to the cost of alternative care, provides probative evidence that Harris Health participates in forcing patients without insurance to sign documents that allow Medicaid/Medicare/GoldCard insurance to pick-up the likely obscene hospital bill, likely riddled with unnecessary treatment costs that are really for the benefit of Harris Health, UT, and Baylor physicians.

201.    This is a recurring practice that gives rise to Federal and State False Claims Act violations.

141.    <u>CAUSE OF ACTION</u>
<u>Federal False Claims Act Violation</u>

1.    Realtors, hereby incorporates and re-alleges all of the foregoing allegations herein.

2.    Based upon the acts described above, Defendants knowingly violated one or more of the following:

    a.    Knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval;

    b.    Knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

   c.  Conspiring with others to get a false or fraudulent claim paid by the federal government; AND

   d.  Knowingly used, or caused to be used, a false record or statement to conceal, avoid, or decrease an obligation to pay money or transmit property to the federal government.

3.  The United States, unaware of the falsity of these claims, records, and statements made by the Defendants, and in reliance on the accuracy thereof, paid money including but not limited to Medicare and Medicaid reimbursement and other health care funds, medical institution research grants, and federal educational funds, to Defendants and/or several of Defendants' health care or health services contractors based on the fraudulent claims.

4.  The United States and the general public have been damaged as a result of Defendant's violations of the False Claims Act.

<u>Texas False Claims Act Violation</u>

1.  Realtors, hereby incorporates and re-alleges all of the foregoing allegations herein.

2.  Based upon the acts described above, Defendants knowingly violated one or more of the following as outlined in Texas Human Resources Code §§ 32.039(b) and 36.001:

   a)  presented or caused to be presented to the commission a claim or claims that contain a statement(s) or representation(s) the person knows or should know to be false;

   b)   failed to provide to Decedent and Realtors a health care benefit or service that the organization is required to provide under the contract with the commission;

c)  failed to provide to the commission information required to be provided by law, commission rule, or contractual provision;

d)  engaged in a fraudulent activity in connection with the enrollment in the organization's managed care plan of an individual eligible for medical assistance or in connection with marketing the organization's services to an individual eligible for medical assistance

e)  Failed to maintain documentation to support a claim for payment in accordance with the requirements specified by commission rule or medical assistance program policy or engages in any other conduct that a commission rule has defined as a violation of the medical assistance program.

3.  The State of Texas, unaware of the falsity of these claims, records, and statements made by the Defendants, and in reliance on the accuracy thereof, paid money including but not limited to Medicare and Medicaid reimbursement and other health care funds, medical institution research grants, and federal educational funds, to Defendants and/or several of Defendants' health care or health services contractors based on the fraudulent claims.

4.  The State of Texas and the general public have been damaged as a result of Defendant's violations of the Texas Human Resources Code Chapters 32 and 36.

## 6. PRAYER

For the reasons set forth above, Realtors, on behalf of the United States and the State of Texas, respectfully requests this Court to find that Defendants have damaged the State of Texas and United States Government as a result of their conduct under the False Claims Act and Texas Human Resources Code §§ 32.039(b) and 36.001.

Realtors prays that judgment enter against all Defendants for all applicable damages, including but not limited to the following:

(a) Actual damages in an amount sufficient to cover all paid false claims.

(b) Civil Penalties in an amount of three times the actual damages suffered by the Government under the 31 U.S. Code § 3729, and in the amount of two times the amount of the payment or the value conferred as allowed under Texas Human Resources Code §§ 32.039(c) and 36.052.

(c) Relators seek a fair and reasonable amount of any award for their contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(d) *et al*.

(d) Relators seek a fair and reasonable amount of any award for their contribution to the Government's investigation and recovery pursuant to Texas Government Code § 531.101.

(e) Attorney's fees and costs awarded to Relator.

(f) Pre-judgment and post judgment interest.

(g) All other relief on behalf of the Relator and/or United States and/or Texas State Government to which they may be entitled at law or equity.

Respectfully Submitted,

/s/ Ernest Adimora-Nweke
By Ernest Adimora-Nweke, Jr. Esq.
State Bar No:  24082602
Adimora Law Firm
5100 Westheimer Rd, Suite 200
Houston, TX - (281) 940-5170
Attorney *for Realtor*

CERTIFICATE OF SERVICE

     I hereby certify that a true copy of the above Qui Tam has this day, June 10, 2016 been delivered to U.S. Attorney General's Office attorneys listed below pursuant to applicable Federal Rules of Civil Procedure (e.g. electronic filing, fax, certified mail, and/or email).

       /s/ Ernest C. Adimora-Nweke Jr

By Ernest Adimora-Nweke
State Bar No:  24082602
Adimora Law Firm
5100 Westheimer Rd, Suite 200
Houston, TX 77056
281.940.5170
Attorney *for Realtor*
Ernest@adimoralaw.com

Served to:

Kenneth Magidson
United States Department of Justice
U.S. Attorney's Office
Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, TX 77002
usatxs.atty@usdoj.gov
Fax line - 713-718-3300

Byron Thomas
United States Courthouse
515 Rusk Ave., Room 5300
Houston, Texas 77002
(713) 250-5512
Byron_Thomas@txs.uscourts.gov

Loretta E. Lynch
Attorney General of the United States
Attorney General of the United States
U.S. Dept. of Justice
950 Pennsylvania Avenue
NW Washington, DC 20530-0001

U.S. Department of Justice
Civil Rights Division
Coordination and Review Section, NWB
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Texas Office of the Attorney General
Medicaid Fraud Control Unit
PO Box 12307
Austin, Texas 78711-2307
(512) 463-2011
(800) 252-8011 (Main agency switchboard)
mfcu@texasattorneygeneral.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above Motion For Leave has this day, June 10, 2016 been delivered to the attorneys listed below pursuant to applicable Federal Rules of Civil Procedure (e.g. electronic filing, fax, and/or email).

        /s/ Ernest C. Adimora-Nweke Jr
By Ernest Adimora-Nweke
   State Bar No:  24082602
   Adimora Law Firm
   5100 Westheimer Rd, Suite 200
   Houston, TX 77056
   281.940.5170
   Attorney *for Realtor*
   Ernest@adimoralaw.com

Served to:

Kenneth Magidson
United States Department of Justice
U.S. Attorney's Office
Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, TX 77002
usatxs.atty@usdoj.gov
Fax line - 713-718-3300

Byron Thomas
United States Courthouse
515 Rusk Ave., Room 5300
Houston, Texas 77002
(713) 250-5512
Byron_Thomas@txs.uscourts.gov

Loretta E. Lynch
Attorney General of the United States
Attorney General of the United States
U.S. Dept. of Justice
950 Pennsylvania Avenue
NW Washington, DC 20530-0001

U.S. Department of Justice
Civil Rights Division
Coordination and Review Section, NWB
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Texas Office of the Attorney General
Medicaid Fraud Control Unit
PO Box 12307
Austin, Texas 78711-2307
(512) 463-2011
(800) 252-8011 (Main agency switchboard)
mfcu@texasattorneygeneral.gov